In re **MEN'S SPORTSWEAR, INC.,** f/k/a **Claude Clement, Ltd., Debtor.**

**MEN'S SPORTSWEAR, INC.,**
Plaintiff–Appellee,

v.

**SASSON JEANS, INC.,**
Defendant–Appellant.

No. 209, Docket 87–5028.

United States Court of Appeals,
Second Circuit.

Argued Sept. 10, 1987.
Decided Nov. 27, 1987.

---

Bernard Schenkler, Roseland, N.J. (David N. Ravin, Robert A. Baime, Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime, Roseland, N.J., on brief), for defendant-appellant.

Michael A. Cardozo, New York City (Marc J. Goldstein, Steven B. Feigenbaum, Proskauer, Rose, Goetz & Mendelsohn, New York City, of counsel), for plaintiff-appellee.

Before PRATT and MAHONEY, Circuit Judges, and BRIGHT, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

BRIGHT, Senior Circuit Judge:

Appellant Sasson Jeans, Inc. (Sasson) appeals a $1.1 million default judgment awarded against it by the bankruptcy court and affirmed by the district court. For reversal, Sasson contends the following: (1) Men's Sportswear, Inc. (Sportswear)

brought a "non-core" proceeding, requiring the district court to review de novo the bankruptcy court's findings; (2) the default judgment should have been vacated by the bankruptcy court; and (3) the bankruptcy court's computation of the damage award was clearly erroneous. We affirm the judgment of the district court but remand to that court on one aspect of the damage award.

## I. BACKGROUND

In August of 1980, Sasson and Sportswear entered into several licensing agreements by which Sportswear was given the right to manufacture and sell men's garments bearing the "Sasson" trademark and logo (hereinafter referred to as Licensed Products). The agreements required Sportswear to pay Sasson a three percent royalty based on net sales of the Licensed Products, which royalties Sasson was required to use for the sole purpose of advertising the Licensed Products. Further, Sasson was required to obtain Sportswear's approval for all advertising paid for by Sportswear's three percent royalty payments.

In 1982, Sportswear filed a breach of contract action in the Supreme Court of New York, alleging that Sasson had breached its obligations under the licensing agreement. Sasson postponed answering the complaint through October 14, 1983, at which point Sportswear filed a Chapter 11 petition with the bankruptcy court. The contract action progressed no further, for Sasson challenged Sportswear's attempt to assume the license agreements as executory contracts under the Bankruptcy Code, and this "license assumption" litigation occupied the parties for the next three years.

The "license assumption" war was fiercely fought. Battles raged over Sasson's reluctance to produce documents, inability to adhere to deposition schedules, and general failure to proceed with the case. Sasson employed several different law firms in succession throughout this litigation. The changing of Sasson's guards frequently occurred just as the case was beginning to

progress toward trial, usually accompanied by a request for adjournment. Sportswear ultimately prevailed in the "assumption" proceedings in May of 1986. Bankruptcy Judge Lifland authorized the assumption and imposed a $1500 sanction against Sasson for its misconduct throughout the litigation.

Two weeks after the conclusion of the assumption proceedings, Sportswear moved for leave to file an additional claim in the breach of contract action. The complaint alleged that Sasson breached its obligations under the license agreements as refined by the 1985–1986 advertising plan devised by both parties.

The promotional plan for the 1984–1985 advertising year (July 1, 1984–June 30, 1985) provided that forty percent of the royalty payments Sportswear made to Sasson would be used by Sasson to fund its own promotional campaign featuring a television commercial by Elton John. The remaining sixty percent would be used by Sportswear subject to content approval by Sasson for those cooperative advertising expenditures Sportswear incurred directly. The parties intended the 1985–1986 advertising program, featuring a commercial made by rock star Simon Le Bon, to be substantially similar to the 1984–1985 program, incorporating the same sixty/forty percent split. The Le Bon commercial, however, was never aired, and Sportswear was not reimbursed for any of its cooperative advertising expenses. Sasson's failure to broadcast the Le Bon commercial or reimburse Sportswear for its expenses formed the basis of the claims Sportswear sought, in the spring of 1986, to add to its original 1982 contract action.

Sasson served no papers opposing Sportswear's motion to amend. Instead, at a June 11 hearing, the firm of David Breitbart (one of the many firms Sasson had retained in the license assumption litigation) sought adjournment of the motion on the grounds that it had believed another firm would represent Sasson in this revived action. Bankruptcy Judge Lifland denied Sasson's adjournment request, and entered an order granting Sportswear leave to

amend and directing Sasson to respond to the amended complaint within ten days of service. The pleading deadline passed without a response by Sasson. Nearly two weeks later, Sasson filed an Order to Show Cause seeking an extension on the ground that it was in the process of finding new counsel. Sportswear filed its own Order to Show Cause for default judgment and contempt sanctions. At a hearing on both Orders, the bankruptcy court found the reason Sasson tendered for its delay in filing an answer insufficient and entered a default judgment in favor of Sportswear on the issue of liability.

Following a hearing on August 14, at which both Sportswear and Sasson fully tried the damage issues, the bankruptcy judge awarded Sportswear $888,707.05 in lost profits caused by Sasson's failure to advertise in the spring of 1986. The judge also ordered Sasson to pay Sportswear an additional sum of $209,195.30 for damages caused by Sasson's failure to reimburse Sportswear for its cooperative advertising expenses pursuant to both the license agreements and the 1985–1986 advertising plan.

On appeal, the district court held that the bankruptcy judge's order was not "clearly erroneous" and thus affirmed the entry of default judgment on liability, and the damage award.

## II. DISCUSSION

### A. *The Bankruptcy Court's Jurisdiction*

Section 157(b)(1) of the 1984 Bankruptcy Amendments and Federal Judgeship Act (B.A.F.J.A.) gives bankruptcy judges the jurisdiction to hear and determine all "core proceedings arising under title 11," subject to traditional appellate review. 28 U.S.C. § 157(b)(1) (Supp. III 1985). Section 157(c)(1) authorizes a bankruptcy judge to hear "a proceeding that is not a core proceeding but is otherwise related," but requires the submission of proposed findings of fact and conclusions of law to the district court for de novo review of those matters to which any party has timely objected. *Id.* § 157(c)(1). In addition, section 157(c)(2) states that a bankruptcy judge may issue final judgments in non-core, but related proceedings with the consent of all parties. *Id.* § 157(c)(2).

Bankruptcy Judge Lifland, in his conclusions of law issued August 1986, expressly determined that Sportswear's contract action was a "core proceeding." Accordingly, the district court reviewed the bankruptcy court's determinations under the "clearly erroneous" standard of review. Sasson contends that Sportswear's proceeding was a non-core action, and thus Judge Lifland's findings should have been reviewed de novo by the district judge. We disagree.

We are inclined to treat Sportswear's breach of contract action as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(M) which includes as a core proceeding "orders approving the use or lease of property * * *." *Id. See Franklin Computer Corp. v. Apple Computer, Inc. (In re Franklin Computer Corp.),* 60 B.R. 795, 803 (Bankr.E.D.Pa.1986) (dispute over order authorizing debtor to use defendant Apple's computer programs was core proceeding); *Gray Line, Inc. v. Sheraton Boston Corp. (In re Gray Line, Inc.),* 62 B.R. 811, 813 (Bankr.D.Mass.1986) (dispute concerning terms of a stipulation between debtor and creditor which later became an Order of the Bankruptcy Court deemed a "core matter"). Like the debtors in *Franklin* and *Gray Line,* Sportswear's seeks to enforce rights assured it by a prior bankruptcy court determination. Its breach of contract action relates not merely to the administration of Sportswear's estate, but to its court-ordered right to incorporate the license agreements with Sasson as part of a Chapter 11 reorganization plan.

However, we need not resolve this issue, for even if the instant action was not a "core" proceeding, 28 U.S.C. § 157(c)(2) empowers the bankruptcy court to enter final judgment in a "non-core" but "related" matter, providing both parties consent to the court's jurisdiction. We conclude that Sasson's failure to object to Judge Lifland's assumption of "core jurisdiction" at any point in these extensive proceedings before the bankruptcy court and the fur-

ther failure to object to any part of the appeal process in the district court constitutes consent to the final adjudication of this controversy before the bankruptcy court. *See DuVoisin v. Foster (In re Southern Indus. Banking Corp.)*, 809 F.2d 329, 331 (6th Cir.1987) (expressing agreement with bankruptcy court cases that the absence of timely objection to the bankruptcy court's jurisdiction constitutes implied consent to the resolution of the controversy and as such permits the bankruptcy court to enter a final judgment as if the case were a core proceeding); *accord Alloy Metal Wire Works, Inc. v. Associated Screw and Mfg. Co. (In re Alloy Metal Wire Works, Inc.)*, 52 B.R. 39, 40 (Bankr.E.D.Pa.1985) (parties implicitly consented to bankruptcy court's jurisdiction by failing to raise timely objection).

We are cognizant that a court should not lightly infer from a litigant's conduct consent to have private state-created rights adjudicated by a non-Article III bankruptcy judge. Indeed, to do so would violate the spirit of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which emphasizes that the power to adjudicate private rights, such as the right to recover contract damages, cannot be lodged in a court lacking "the essential attributes of the judicial power." *Id.* at 87, 102 S.Ct. at 2880, 73 L.Ed.2d at 625. However, in the instant case, Sasson's silence on the jurisdictional issue before both Judge Lifland and the district judge can only be construed as implied consent. Sasson had several opportunities to object to Judge Lifland's assumption of jurisdiction: at the hearing on June 11 at which Judge Lifland ordered Sasson to respond to Sportswear's amended complaint; while seeking mandamus relief in the district court on the grounds that its filing of a notice of appeal from the bankruptcy court's interlocutory order had divested that court of jurisdiction; when the judge issued its conclusions of law, following the hearing on damages; and, of course, any time throughout the

district court proceedings. Sasson's protest at this stage in the litigation more closely resembles an afterthought than a bona fide objection. We determine that Sasson impliedly consented to the bankruptcy court's assumption of "core" jurisdiction, and thus the district court correctly reviewed that court's findings under the "clearly erroneous" standard.

### B. *The Default Judgment*

Rule 55(a) of the Federal Rules of Civil Procedure provides that a default may be entered against a party against whom a judgment for affirmative relief is sought and Rule 55(c) allows the court to set aside an entry of default for "good cause shown." [1]

Sasson contends that the bankruptcy court erred both in entering a default judgment against Sasson and in later refusing to vacate the judgment. Sasson argues that in considering whether to vacate the judgment, the bankruptcy judge erroneously relied upon the higher "excusable neglect" standard of Rule 60(b), rather than the standards set forth in Rule 55(c). Under Rule 55(c), the factors governing whether a party should be relieved from default are whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented. *Brock v. Unique Racquetball and Health Clubs, Inc.*, 786 F.2d 61, 64 (2d Cir.1986); *Traguth v. Zuck*, 710 F.2d 90, 94 (2d Cir.1983). Sasson argues that had the bankruptcy court applied this standard, it could not have allowed the default to stand.

A trial court's determination in entering a default judgment is entitled to great deference. *See Marziliano v. Heckler*, 728 F.2d 151, 156 (2d Cir.1984). Indeed, "[b]ecause the trial judge is 'the person most familiar with the circumstances of the case and is in the best position to evaluate the good faith and credibility of the parties,' a reviewing court will defer to his decision unless it is clearly wrong." *Id.* at

---

**1.** Rule 55(c) also provides that if a judgment by default has been entered, the court may set it aside in accordance with Fed.R.Civ.P. 60(b).

156 (quoting *Davis v. Musler*, 713 F.2d 907, 912 (2d Cir.1983)). The record indicates that even under the more lenient standards of Rule 55(c), the imposition of default judgment against Sasson was justified.

 Sasson maintains that the bankruptcy and district courts erroneously found Sasson's default was willful based on the behavior of Sasson and counsel in the prior "license assumption" proceeding. We disagree. The filing of a complaint in a new action does not erase a litigant's past abuse of the judicial system. Sasson's current counsel argues that the bankruptcy judge should have levied sanctions against Sasson's prior counsel rather than issuing a default against the client, Sasson. Such a sanction might be appropriate were it clear that Sasson was an innocent victim whose case was being mishandled by counsel. The record belies such a characterization of the parties. Similar maneuvers in the earlier "license assumption" and breach of contract proceedings indicate that Sasson engineered the obstructionist tactics which hindered both actions. Sasson's failure to timely respond to Sportswear's amended complaint was yet another example of such tactics. Thus, it was entirely proper for Bankruptcy Judge Lifland to consider Sasson's conduct in the "license assumption" proceeding when deciding whether Sasson's default was willful. The record amply supports Judge Lifland's finding of willful misconduct by Sasson.

As to the factors of prejudice and merit identified in Rule 55(c), Sportswear produced before the bankruptcy court ample evidence establishing prejudice should the default judgment be vacated. Further, Sasson presented numerous defenses to the allegations lodged against it at the August 14 hearing before Judge Lifland on damages and these defenses were rejected as spurious.

## C. *The Damage Award*

Bankruptcy Judge Lifland awarded Sportswear nearly $1.1 million in damages. Sportswear received $888,707.05 in lost profits due to Sasson's failure to advertise in the spring of 1986, and an additional $209,195.30 to compensate Sportswear for Sasson's failure to reimburse Sportswear for the cooperative advertising expenses it incurred throughout the 1985–1986 advertising year. Sasson appeals virtually every aspect of Judge Lifland's award, arguing first that Sportswear suffered no damages, and, second, that Judge Lifland's computation of the lost profits and reimbursement award was "clearly erroneous."

We will not disturb the factual findings of the bankruptcy court unless we find them clearly erroneous. *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir.1987). Clearly erroneous findings leave the reviewing court with a "definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985).

 The record indicates that Sportswear suffered substantial damages due to Sasson's failure to advertise. Although the calculation of lost profits involves some level of uncertainty, "it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *accord S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 852 (2d Cir.1987). The bankruptcy court's calculations as to lost profits fall well within the bounds of "just and reasonable inference," and thus we resolve, as did the district court, to uphold that award.

The award to Sportswear of $209,195.30 is more nettlesome and merits some discussion. Bankruptcy Judge Lifland computed the amount as follows: Sportswear paid to Sasson royalties of $447,702.12, allocable to the 1985–1986 advertising year. In accordance with the 1985–1986 advertising plan, sixty percent of that sum, or $268,621.27, was to be used by Sportswear for cooperative advertising. Though it spent approximately $129,000, Sportswear only sought reimbursement for approximately $83,000. The bankruptcy judge subtracted the difference, $46,286.97, from the total $268,-

621.27 as expenses which Sportswear itself acknowledged were non-reimbursable. The judge further determined that Sportswear had sought reimbursement for several expenses that fell outside the "cooperative advertising agreement" and thus subtracted an additional $13,139.00 from the amount Sasson should pay. The final tally yielded a sum of $209,195.30.

Sasson contests this award of $209,195.30 because the advertising plan requires reimbursement of expended advertising costs only, and Sportswear's actual cooperative advertising expenses during the 1985–1986 advertising year did not exceed $129,027.30. Sportswear counters that Sasson is responsible for the reduced spending by Sportswear of less than half of what it was allowed to spend under the license agreements. After having submitted invoices totalling $83,000 for reimbursement and receiving no payment from Sasson, Sportswear determined that it could not afford further unreimbursed expenses.

Both parties claim they are entitled to the percentage of the royalty payments which Sportswear was technically entitled to receive, but did not actually spend. Sasson claims that awarding Sportswear $139,594.27, in excess of the amount actually spent, grants them a windfall judgment. Sportswear argues that to allow Sasson to retain the $139,594.27 which, absent Sasson's breach, Sportswear would have expended, would constitute a similar windfall to Sasson. Our review of the parties' license and advertising agreements indicates that Sportswear was rightfully awarded the money, but that the award should be accompanied by stipulations regarding how it is to be expended.

### D. The License Agreements and 1984–1985 Advertising Plan

The license agreement which Sasson and Sportswear entered into in 1980 contemplated an arrangement by which each company was to mutually benefit from the promotion of men's apparel sporting the Sasson logo. In return for the "exclusive right and license to use the Licensed Marks" in designated areas, Sportswear was obligated to pay a three percent royalty based on net sales of the Licensed Products. The agreement stipulates that the three percent royalty was to be used "for the sole purpose of advertising the Licensed Products * * *" and details a procedure by which each party first submits its advertising plan for the other's approval.[2] The advertising plan for 1984–1985 further detailed how the three percent royalty was to be spent, allocating forty percent to Sasson for its promotional campaign, and sixty percent for cooperative advertising engaged in by Sportswear, "subject to content approval by Sasson." Significantly, the plan mandates "any unused portion of said 60% may be carried over for use in the next succeeding month up to March 31, 1985. If by March 31, 1985 there remains a portion of the aforesaid 60% unspent and uncommitted, Sasson shall have the right to allocate such balance to the foresaid use by Sasson." The evidence showed, and the bankruptcy court and district court so found, that the parties agreed to divide the 1985–1986 royalty payment in the same manner.

The license agreement and advertising plans clearly indicate that both parties intended Sportswear's royalty payments to Sasson be used to promote the sportswear

---

2. Paragraph 5 of the Amended and Restated License Agreement states:

5. It is agreed that Licensee shall have the right to approve all advertising to be done by Licensor relevant to Licensee's three percent (3%) advertising royalty payment. In the event that Licensee does not approve of Licensor's advertising plan relevant thereto, which shall be submitted in writing to Licensee in the same manner in which Licensee submits material for approval pursuant to subsection (3) of Article II, Licensee shall submit an advertising plan to Licensor. Upon approval by Licensor in accordance with Clause 2b of Article II, Licensee shall have the right to repayment by Licensor of the three percent (3%) royalty paid by Licensee and not allocated to a prior approved plan. Licensee shall then use, without fail, said repaid advertising royalty for the purpose of advertising in accordance with the plan approved by Licensor.
Amended and Restated License Agreement, p. 28.

manufactured by Sportswear and sold under the Sasson label. Sportswear did not unconditionally deliver its license payments to Sasson to spend as Sasson saw fit. Under no circumstances did the license agreement permit Sasson to spend this sum in furtherance of the Sasson business, apart from its venture with Sportswear.

It is well settled that if the plaintiff has made money payments to the defendant, and there is a failure of consideration whereby defendant materially breaches the contract, the plaintiff can maintain an action for restitution of the money so paid to the defendant, with interest. *Adams v. Henderson,* 168 U.S. 573, 18 S.Ct. 179, 42 L.Ed. 584 (1897); *see also Mais v. Futuristic Foods, Inc.,* 90 Misc.2d 259, 394 N.Y.S. 2d 359 (1977), *aff'd,* 95 Misc.2d 834, 414 N.Y.S.2d 822 (1978). Sportswear made monthly payments to Sasson with the expectation that Sasson would adhere to the license agreements and reimburse Sportswear for its cooperative advertisement expenses. Sasson breached that duty, and thus Sportswear is entitled to restitution of that part of the royalty payment which the license agreements set aside for Sportswear's advertising expenses.

The difficulty in awarding Sportswear the entire sixty percent of the royalty payment[3] is that the award assumes, absent Sasson's breach, that Sportswear would have spent the entire amount. Such an assumption is reasonable in light of Sportswear's evidence that it incurred fifty percent of its reimbursable advertising expenditures for the entire fiscal year by December of 1985, at which point it had concluded that any further expenditures would not be reimbursed. However, just as it would be inequitable to allow Sasson to retain the remainder of the amount allocated for cooperative advertising for its own purposes, so too is it unjust to grant Sportswear unfettered use of the money. Sixty percent of Sportswear's royalty payment, $268,621.27, was set aside to fund projects which promote Sportswear's products carrying Sasson's name. Judge Lif-

land found that $69,601.03 of the $83,000 Sportswear spent were valid and reimbursable expenses, and thus that $69,601.03 of the approximately $209,195.30 award can be properly characterized as reimbursement money which carries with it no restrictions. However, equity requires that the remaining $139,594.27 be used in furtherance of similar cooperative advertising projects.

Judge Lifland, to minimize future conflict between the parties, directed that Sportswear make its future royalty payments to an advertising agency which is to decide how the three percent advertising royalties are to be spent and authorize reimbursement for Sportswear's approved advertising. Thus, a mechanism already exists to enforce this court's decree. We remand to the district court to issue directions to the bankruptcy court that the $139,594.27 which exceeded Sportswear's actual expenditures in the 1985–1986 year be used to reimburse Sportswear for additional and supplementary advertising expenses exceeding the percentage of the royalty payments allocated to it for cooperative advertising expenses in future years. Thus, the fund will benefit both parties by increasing the funds available for advertising the Licensed Products.

## III. CONCLUSION

We affirm, subject to a remand for modification of the judgment with respect to $139,594.27 of the award which sum shall be set aside for advertising in conformity with this opinion.

---

**3.** Minus the amounts for which Sportswear did not seek reimbursement and those expenses dis-

allowed by Judge Lifland as ineligible for reimbursement under the terms of the agreement.