In re Alfred STEWART, Debtor.

Alfred STEWART, Plaintiff,

v.

CREDITHRIFT OF AMERICA CONSUM-
ER DISCOUNT CO., INC., and Louis
Abrahamsen, t/a Century Carpet &
Contractors, Defendants.

Bankruptcy No. 87–06121S.
Adv. No. 88–0359S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 8, 1988.

Hilda Burgos, Community Legal Services, Inc., Philadelphia, Pa., for debtor.

John A. Wetzel, Philadelphia, Pa., for Abrahamsen.

Arnold Lieberman, Marlena Siegel, Philadelphia, Pa., for defendant/CREDITHRIFT.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant little adversarial proceeding presents to us a glimpse of the dark side of the marketplace, revealing that, as in the 1960's, the poor may still pay far more for everyday consumer goods than more affluent members of the community. *See* D. CAPLOVITZ, THE POOR PAY MORE, 81–104 (1967); and W. MAGNUSON & J. CARPER, THE DARK SIDE OF THE MARKETPLACE, 32–41, 75–76, 118–20 (1968). As described in those documentaries, describing the lot of low-income consumers in the 1960's, we find that merchants who charge—and get—exorbitant prices for consumer goods and finance companies which protect them through probable feigned innocence of the merchants' activities are alive and well in the late 1980's. It also exemplifies that consumer protection legislation of the 1970's is available to protect disadvantaged consumers from some of the practices recognized as unfair in the 1960's, but that new devices contrived by ghetto merchants to circumvent such remedial legislature require a liberal interpretation of such legislation to blunt such exploitation. *Cf. In re Fleet, Fleet v. United States Consumer Council, Inc.*, 95 B.R. 319, 331–336 (Bankr. E.D.Pa.1988) (Recommendation of Bankruptcy Judge to District Court).

Given our belief that the transaction here is representative of the worst sort of exploitive tactics, we do not hesitate to find both the Seller and the Finance Company involved in this transaction as potentially liable under the full extent of legislation of the 1970's, which we believe must be liberally interpreted to discourage these tactics. However, the victimized Debtor-consumer's settlement with the Seller here limits his damages to the agreed figure of $2,500.00. An express limitation written into the consumer legislation which allows the Debtor to pursue the finance company restricts his claims against that party to the $437.64 paid by the Debtor under the parties' contract. In light of many statutory violations implicated in the instant transaction and the reduction in their respective liabilities as a result of the aforementioned limitations, we have no hesitancy striking any security interest of the Finance Company in the goods in question and in imposing the Debtor's reasonable attorney's fees and costs incurred in prosecuting this proceeding against both Defendants, jointly and severally.

### B. PROCEDURAL HISTORY

The Debtor, REVEREND ALFRED STEWART (hereinafter referred to as "the Debtor"), a 62–year–old part-time "field minister and evangelist" who, with his 74–year–old disabled, non-debtor spouse Gertrude, subsists on Social Security and SSI disability benefits, filed the Chapter 13 bankruptcy case underlying this proceeding on December 8, 1987. After five continuances, a year later we have scheduled his Confirmation hearing for what we have specifically stated will be the last time on December 13, 1988.

The instant adversary proceeding was filed on February 26, 1988. Named as Defendants were CREDITHRIFT OF AMERICA CONSUMER DISCOUNT CO. (hereinafter "the Finance Company") and JOHN DOE, trading as CENTURY CARPET & CONTRACTORS (hereinafter "the Seller"). In rather modest and vague fashion, the Complaint alleged that, on February 27, 1987, the Debtor had purchased a

television (hereinafter "TV") and a video cassette recorder (hereinafter "VCR") from the Seller in which the cash price, though stated on the contract to be $2,090.00, was in fact "approximately $900.00." Consequently, the Defendants were said to be liable to the Debtor under the federal Truth-in-Lending Act, 15 U.S.C. § 1601, et seq. (hereinafter "TILA"); the Pennsylvania Goods and Services Installment Sales Act, 69 P.S. § 1101, et seq. (hereinafter "GSISA"); the applicable Pennsylvania usury law, Act No. 6 of 1974, 41 P.S. § 101, et seq. (hereinafter "Act 6"); and the Pennsylvania Unfair Trade Practices and Consumer Protection law, 73 P.S. § 201–1, et seq. (hereinafter referred to by its generic designation as a law regulating unfair and deceptive acts and practices, or "UDAP"), in certain undesignated sums. Both Defendants answered; in his Answer, the Seller identified himself as Louis Abrahamsen.

The matter came before us for trial on June 23, 1988. The Debtor's testimony registered a few surprises for all involved, including, apparently, his own counsel. In particular, he stated that his wife had signed the contract in blank in his home and that he had never remitted the $190.00 disclosed on the contract as a downpayment, a fact unlikely to be fabricated. The Debtor also attempted to call as a witness Alieda Garcia, a paralegal in his counsel's office, as a witness to the Seller's pricing policies derived from her experience in a subsequent investigatory visit to the Seller's place of business. Unfortunately, we were compelled to sustain objections to much of her testimony as hearsay and irrelevant, because she attempted to relate conversations from unidentified store personnel and she did not observe or price the same items as were sold to the Debtor.

Mr. Abrahamsen then took the stand and admitted the key element that the Debtor was trying to prove through Ms. Garcia's testimony: that he marked up items greater than twice their *retail* price in order to accommodate his liberal credit policies. Jack Breen, a Finance Company officer, attempted to establish his employer's distance from the unseemly pricing aspects of the transaction, stating that the Finance Company concentrated only on the amount advanced to the Debtor and his ability to repay it, and not on what was sold to the Debtor. He also stated that the Debtor had made but six payments of $72.94 pursuant to the contract, a total of $437.64.

In light of the surprises to her during the trial, the Debtor's counsel orally moved, at the conclusion thereof, to amend the Complaint to add claims for additional TILA violations arising from the misstatement that the Debtor had made a downpayment, thus inflating the cash price further but making it appear to the Finance Company that the Debtor had additional equity in the items purchased. See Bankruptcy Rule (hereinafter "B.Rule") 7015 and Federal Rule of Civil Procedure (hereinafter "F.R. Civ.P.") 15(b). Since the Defendants objected to this motion, we issued an Order of June 24, 1988, directing the Debtor to file a motion to amend the Complaint and to file a Brief supporting both the motion to amend and his position on the merits of the proceeding on or before July 8, 1988, with the Defendants to respond by July 15, 1988. The parties each requested an extension of these time-periods and the Debtor ultimately filed a motion to amend the complaint and Proposed Findings of Fact and Conclusions of Law, based on the proposed Amended Complaint, on August 5, 1988. The Finance company filed an Answer to the Amended Complaint, apparently indicating lack of opposition to the motion to amend, and a Brief in support of its position on August 22, 1988. The Seller opposed the motion to amend and it was listed for a hearing on September 6, 1988. On that day, we granted the motion, but allowed the Seller additional time for filing an answer and taking discovery, and we offered the parties an opportunity to present any supplementary evidence on October 20, 1988.

The October 20, 1988, hearing was continued to October 27, 1988, at which time we were advised that the Debtor and the Seller had reached a settlement and that neither the Debtor nor the Finance company wished to supplement the record. At its

request, we allowed the Finance Company until November 7, 1988, to file a supplemental Brief. On October 31, 1988, the Seller and the Debtor signed a Stipulation whereby the Seller agreed to pay the Debtor $2,500.00 in satisfaction of all of the Debtor's claims against the Seller except attorney's fees, liability for which was still at issue, on or before November 18, 1988. We declined a request that we approve this Stipulation because its approval appeared contrary to B.Rule 7041 and F.R.Civ.P. 41(a). However, we do not doubt that its terms are enforceable as between the parties to it and we therefore shall work the terms of the Stipulation into our Order.[1]

The facts, as between the remaining parties contesting the merits, *i.e.*, the Debtor and the Finance Company, are mostly undisputed. Nevertheless, pursuant to B.Rule 7052 and F.R.Civ.P. 52(a), we are obliged to present our decision in the form of Findings of Fact and Conclusions of Law. We shall include our discussions of the rather interesting legal issues presented directly after the respective Conclusion of Law to which they are pertinent.

## C. FINDINGS OF FACT

1. In early February, 1987, the Debtor called the Seller on the telephone in response to an advertising circular concerning availability of appliances and furniture on credit at the address of a store known as "M. London," located at 500 West Girard Avenue in a low-income neighborhood of Philadelphia.

2. The Debtor, as mentioned above, an elderly part-time minister with limited income, informed the Seller via the telephone that he was interested in purchasing a 25-inch color TV and a VCR on credit. The Seller proceeded to elicit from him all of the information necessary to fill out a credit application in the telephone conversation.

3. Several days later, on February 27, 1987, the Seller went to the home of the Debtor and his wife with a blank two-page installment sale contract form provided by the Finance Company and bearing its name. The Finance Company had, in conversations with the Seller, already orally approved the Debtor's credit application as the result of its oral review of the contract terms with the Seller. However, it indicated that it was concerned only with whether the Debtor was a good credit risk for the amount of credit in the contract, not whether the prices charged for the goods purchased were reasonable.

4. The Debtor's elderly wife, being homebound, signed the blank contract at the home. The Seller then drove the Debtor to the M. London store where the Debtor picked out the particular TV and VCR that he desired to purchase. Thereafter, the Seller completed the installment sale contract, and it was then signed by him and the Debtor.

5. Prior to the execution of the contract, the Seller never quoted Plaintiff any prices for the TV and VCR, and none of the items in the M. London showroom had price

---

1. We believe that the pleadings and these procedural developments establish that this proceeding is either a "core proceeding," *see* 28 U.S.C. § 157(b)(2)(A), (E), (O); *In re Jackson,* 90 B.R. 126, 128–31 (Bankr.E.D.Pa.1988); and *In re Windsor Communications Group, Inc.,* 67 B.R. 692, 694–96, 700 (Bankr.E.D.Pa.1986), or is a matter which the parties have consented that we hear and determine. *See* 28 U.S.C. § 157(c)(2). In his pleadings, the Debtor, pursuant to B.Rule 7012(b), averred, *inter alia,* that this is a core proceeding, which clearly expresses his intention that we determine it. See Complaint and Amended Complaint, ¶ 2. The Seller admitted these allegations without qualifications in his Answer and has entered into a Stipulation resolving his liability in the matter in this court, thereby indicating his express consent to our determining it. The Finance Company, in response to the Debtor's allegation that this matter is a core proceeding, pleads as follows: "It is admitted that plaintiff claims jurisdiction as stated." This response, in our view, "does not unequivocally deny the allegation, but is pregnant with an admission," 2 A J. MOORE, ¶ 8.24, at 8–170 (2d ed. 1988), and thus admits the Debtor's allegations. None of the Finance Company's other submissions express a desire that this court should not determine it. Such a position is, we believe, an "express consent" that we determine this proceeding even in the face of the restrictive language of B.Rule 7012(b). *Cf. In re Men's Sportswear, Inc.,* 834 F.2d 1134, 1137–38 (2d Cir.1987); *In re Wicaco Machine Co.,* 60 B.R. 415, 417 (E.D.Pa.1986); and *In re A.I.A. Industries, Inc.,* 75 B.R. 1013, 1017 (Bankr. E.D.Pa.1987).

tags. However, as the Seller admitted, M. London would have charged any customer only $867.00 for the TV and VCR in issue, and the Seller paid M. London only $867.00 for the items that he sold to the Debtor.

6. The Seller testified that he was provided with a rent-free office at the M. London store, shared a telephone with the store, sold only items which M. London carried, and sold these items only on credit. Also, the store provided free delivery and installation services to the Seller's customers as well as its own.

7. The contract disclosed a cash sale price of $2,090.00, and recited that the Debtor had made a downpayment of $190.00. In fact, the Debtor made no such downpayment and the total price, which also included a $19.95 TV antenna, was $1,900.00. After addition of $117.90 for credit life and disability insurance, the total sum of $2,017.90 was financed at an annual percentage rate (hereinafter "APR") disclosed as eighteen (18%) percent per year, over 36 months, resulting in a disclosed finance charge of $607.94. With respect to payment terms, the contract called for 36 payments of $72.94 each, or total payments of $2,625.84.

8. As was contemplated by the contract form and prearranged by those parties, the Seller immediately thereafter assigned the contract to the Finance Company.

9. The contract included the following language, in accordance with 16 C.F.R. § 433.2 and 69 P.S. § 1402 of the GSISA:

NOTICE

ANY HOLDER OF THIS CONSUMER CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

**2.** Actually, the figure for the cost of insurance is artificially inflated, because the credit life and

10. The Debtor reasonably concluded that he was dealing directly with the M. London store and he had no knowledge that M. London was selling these items at retail for only $867.00. He recognized that the prices which he paid under the contract were very high, but he believed that his only option was to purchase similar items from a "rent-to-own" company, whose prices he had discovered were even higher than those which he agreed to pay to the Seller pursuant to the instant contract.

11. The Debtor, though intending to pay for these items per the contract, had made only six (6) payments on the contract, for a total of $437.64, when he encountered financial difficulties. He has retained the goods, subject to a purchase money security interest in favor of the Finance Company. Neither the Finance Company nor the Debtor, on its behalf, has filed a Proof of Claim in the Debtor's Chapter 13 case.

## D. CONCLUSIONS OF LAW

### 1. A "HIDDEN FINANCE CHARGE" OF $1,344.01 WAS IMPOSED UPON THE DEBTOR IN THE INSTANT TRANSACTION

The sole issue raised in the Debtor's original Complaint and the centerpiece of all of the claims articulated in his Amended Complaint is the contention that the "real" cash price in the transaction was $867.00, not $1,900.00 as disclosed in the contract. Under the GSISA, which the parties do not dispute applies to this transaction, the maximum permissible finance charge is simple interest, or interest expressed as an annual percentage rate (hereinafter "APR") of eighteen (18%) percent per annum. 69 P.S. § 1501(a). On an obligation of $867.00, paid over 36 months, the maximum permissible finance charge under 69 P.S. § 1501(a) would be $262.40. The maximum permissible charge of an obligation in the amount of $984.90, the sum of $867.00 and the $117.90 for credit life and disability insurance included in the contract in issue, would be $296.95.[2]

disability on a contract for a lesser amount financed would be less than that charged in this

By way of contrast, the Debtor here was charged a disclosed finance charge of $607.94. This charge was imposed by calculating the amount financed as $2,017.90. We believe that the facts establish that the difference between the articulated unpaid balance of the cash price ($1,900.00) and the "real" cash price ($867.00) was a $1,033.00 "hidden" finance charge. The actual finance charge was therefore $607.94 plus $1,033.00 or $1,640.94, an increment of $1,343.99 over $296.25, the actual maximum permissible finance charge under 69 P.S. § 1501(a).

The Finance Company contends that these additional charges to the Debtor were not "hidden." It argues that the total figure of $1,900.00, further increased by the erroneous statements that the cash price was $2,190.00 and that the Debtor made a $190.00 downpayment, are clearly stated on the contract. The Debtor was not, argues the Finance Company, overcharged or at least overcharged unwittingly. Even if the price was unreasonably high, the Debtor was merely paying a sum of which he was well aware and voluntarily agreed to pay for the TV and the VCR.

Further, the Finance company argues that the Debtor is requesting this court to regulate the price that a retailer may charge to a customer. If the customer agrees, as did the Debtor here, the Finance Company contends that there should be no limits on what a retailer may charge.

Finally, it contends that, if any party involved in the transaction was victimized, it was the Finance Company itself, not the Debtor. It states that, unlike the Debtor, it had no opportunity to note the discrepancy arising from the recitation of the artificial downpayment. It accepted the contract in misplaced reliance that a downpayment of about ten (10%) percent of the cash price had been paid by the Debtor. In light of the Debtor's bankruptcy, it is left with payments of less than the fair market value of the goods under even the Debtor's contention that the value was close to the true price was $867.00 and thus with a relatively worthless security interest in goods worth less than the Seller represented them to be.

■ The flaw in the Finance company's reasoning is failing to recognize that consumer protection laws must be read with a built-in agenda of protecting the unwary and the disadvantaged consumer from entering into transactions which the legislation has deemed constitute. overreaching and hence prohibiting certain practices as a matter of public policy. Such legislation was not, generally, drafted to protect lenders, who have far more resources and leverage in controlling the terms of the marketplace than do low-income consumers. Thus, the grotesque but we suspect all too common pricing scheme of the Seller exemplified by the facts of this case must be approached from the vantage point of not what a consumer residing in an inner-city neighborhood, in desperation due to lack of alternatives, might be willing to pay for a small share of "the good life," but what the legislature has deemed is the maximum that can be charged to any consumer in such a transaction and no more. *See generally In re Russell,* 72 B.R. 855, 867–68 (Bankr.E.D.Pa.1987) (usury laws were passed in large part to protect consumers in desperate finance straits from agreeing to pay unconscionable interest rates which they might otherwise be tempted to pay); *Fleet, supra,* 336–337 (consumers apparently willing to pay fees to company which merely referred them to bankruptcy counsel entitled to recovery of the entire excessive charges paid).

■ The Debtor is not arguing that the price should be regulated. The Seller has candidly told us that the M. London store, itself a ghetto merchant unlikely to be a fertile place for bargains, was selling the items purchased by the Debtor for an $867.00 retail price. The only difference between a consumer's dealing with M. London and the same consumer's dealing with the Seller here is that the latter provided

---

contract. We also note that the Debtor computes the maximum permissible finance charge on an amount financed of $984.90 as $296.93, $.02 less than our calculations. The correct maximum finance charge is obviously somewhere between $262.40 and $296.95.

convenient credit terms. It is therefore clear, under these facts, that the additional price charged by the Seller over that charged for the same goods by M. London is, in actuality, a finance charge.

■ Finally, we can shed no tears for the Finance Company. Were it not for the "hear no evil, see no evil" attitude of the Finance Company, which supplied forms and, in one sense, provided credit directly to the Debtor through the mere medium of the Seller as its agent, the scheme of the Seller could not have been successfully financed. In light of the facts that the Seller used the Finance Company's forms and was able to get it to approve credit in this transaction with a mere telephone call, it is obvious that the Seller and Finance Company deal extensively with one another. We can therefore safely assume that the figurative slap on the wrist of this decision has been more than offset by a number of low-income consumers who have ignorantly plodded their way through payment of almost $3,000.00 for goods which a higher-income consumer could purchase at less than a quarter of this sum.

Our conclusion that the hidden finance charge imposed here is impermissible has been roundly supported by the small body of law which has developed when low-income consumers have found their way to legal help able to scratch beneath the surface of an opportunistic but apparently legal transaction and present the difficult proof that the "real" value of a product is far less than the articulated sale price, and that the price is inflated solely as a charge for the seller's liberal credit policies and hence is in fact a cost of credit.

The most memorable decision in this line of cases is *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1972). There, the Supreme court upheld the Federal Trade Commission's "four-installment rule," which required TILA disclosures to be made in any transaction where payments were made in four or more installments, whether any finance charges were claimed to be imposed or not, on the theory that finance charges were very likely to be hidden in any such arrangement. The Court, per Chief Justice Burger, noted the very problem which we address here in the following passage, *id.* at 366–67 & n. 26, 93 S.Ct. at 1659 & n. 26:

One means of circumventing the objectives of the Truth in Lending Act, as passed by Congress, was that of "burying" the cost of credit in the price of goods sold. Thus in many credit transactions in which creditors claimed that no finance charge had been imposed, the creditor merely assumed the cost of extending credit as an expense of doing business, to be recouped as part of the price charged in the transaction. (Footnote 26) Congress was well aware, from its extensive studies, of the possibility that merchants could use such devices to evade the disclosure requirements of the Act. The Committee hearings are replete with suggestions that such manipulation would render the Act a futile gesture in the case of goods normally sold by installment contract. (Footnote 27 omitted).

---

Footnote 26

For example, two merchants might buy watches at wholesale for $20 which normally sell at retail for $40. Both might sell immediately to a consumer who agreed to pay $1 per week for 52 weeks. In one case, the merchant might claim that the price of the watch was $40 and that the remaining $12 constituted a charge for extending credit to the consumer. From the consumer's point of view, the credit charge represents the cost which he must pay for the privilege of deferring payment of the debt he has incurred. From the creditor's point of view, much simplified, the charge may represent the return which he might have earned which he had been able to invest the proceeds from the sale of the watch from the date of the sale until the date of payment. The second merchant might claim that the price of the watch was $52 and that credit was free. The second merchant, like the first, has foregone the profits which he might have

achieved by investing the sale proceeds from the day of the sale on. The second merchant may be said to have "buried" this cost in the price of the item sold. By whatever name, the $12 differential between the total payments and the price at which the merchandise could have been acquired is the cost of deferring payment.

A series of cases arising in the 1970's concerning practices of certain health spas also recognized this concept. *See Joseph v. Norman's Health Club, Inc.,* 532 F.2d 86, 93–94 (8th Cir.1976); *Kriger v. European Health Spa, Inc.,* 363 F.Supp. 334, 336–38 (E.D.Wis.1973); and *Glaire v. LaLanne-Paris Health Spa, Inc.,* 12 Cal.3d 915, 528 P.2d 357, 358–60, 117 Cal.Rptr. 541, 542–44 (1974). In each of those cases, the spas sold contracts to consumers at established prices in both cash and credit sales, a factor making those cases *weaker* than that made out by the Debtor here, but the consumers were able to establish that a very large percentage of the contracts were sold on credit and were immediately thereafter assigned to loan companies at very large discounts. These cases held that these transactions were characterized by a "burying" of the cost of credit, *Glaire, supra,* 528 P.2d at 359–60, 117 Cal.Rptr. at 543–44, or a "concealing" of it, *Kriger,* 363 F.Supp. at 337, or "pass[ing] along to the consumer ... a charge for the use of credit," *Joseph, supra,* 532 F.2d at 93. Hence, they each held that the discount must be disclosed as part of the finance charges in the transactions.

A final line of cases involve auto dealers who claimed to be selling vehicles to customers with no finance charges. *See Yazzie v. Reynolds,* 623 F.2d 638, 643 (10th Cir.1980); *Killings v. Jeff's Motors, Inc.,*

490 F.2d 865, 865–66 (5th Cir.1974); *Vines v. Hodges,* 422 F.Supp. 1292, 1297, 1299 (D.D.C.1976); and *Rowe Auto & Trailer Sales, Inc. v. King,* 257 Ark. 484, 517 S.W. 2d 946, 947–48 (1975). In each of those cases, the courts recognized that, if the consumer were able to show that the price at which a vehicle could be purchased for cash was increased solely because the vehicle was being sold on credit, then the differential in "real" cash price of the vehicle and the articulated cash price should be held to be a finance charge. These cases also exemplify the difficulty in proving the "real" value of the item sold. Only in *Killings,* where the parties stipulated to a book value as the actual cash price of the vehicle sold, was a finding of the presence of a "hidden" finance charge made. In *Rowe,* the consumer presented testimony, similar to that proffered by Ms. Garcia here, that a car priced at $995.00 on credit terms was available for $450.00 on cash terms. The appellate court stated, we think incorrectly, that, in addition, expert testimony of value was needed to prove the consumer's case; therefore, a trial-court judgment for the consumer was vacated, and the case was remanded. We believe that it was quite sufficient for the consumer to have established that the same dealer would have sold the same car for less in a cash deal than in a credit transaction. Here, the Seller himself provided an admission even more revealing than the concession of the seller in *Killings.* Thus, the flawed attempt to provide evidence of a price differential due solely to enhanced credit terms through the medium of Ms. Garcia's testimony was unnecessary.[3]

We therefore have no difficulty in concluding that at least $1,343.99 of "hidden" finance charges were imposed upon the

---

3. The record in this case suggests one other area where the same sort of reasoning might be appropriate: in considering the practices of the "rent-to-own" industry. The Debtor testified that rent-to-own businesses charged higher prices than even the Seller here, and hence caused him to accept the Seller's terms. "Rent-to-own" transactions are surely sales under the GSISA, as amended on February 26, 1988. *See* 69 P.S. § 1201(6), as amended; and *Chandler v. Riverview Leasing, Inc.,* No. 1984-CE-2736

(Northampton Co. C.P. May 14, 1986) (per VAN ANTWERPEN, J.). *Cf. Sight & Sound of Ohio, Inc. v. Wright,* 36 B.R. 885, 888–93 (S.D.Ohio 1983); *In re Baker,* 91 B.R. 426, 428 (Bankr.N.D. Ohio 1988); and *In re Fogelsong,* 88 B.R. 194, 195–96 (Bankr.C.D.Ill.1988). The liberal "credit terms" in such transactions which are offered to largely low-income customers also would appear to be "hidden finance charges" which greatly enhance the "prices" of the items "sold" in a "rent-to-own" transaction.

Debtor in this transaction. The extensive overreaching presented by this transaction, exemplifying a target of the works of Caplovitz and Magnuson and Carper, cited at page 879 *supra,* can thus be translated into a series of illegal as well as unconscionable acts.

### 2. THE PRESENCE OF A "HIDDEN FINANCE CHARGE" RENDERS THE CONTRACT IN ISSUE VIOLATIVE OF THE TILA, THE GSISA, AND UDAP

The conclusion that a "hidden finance charge" exists which was not disclosed as such opens a Pandora's box of claims, most of which are aptly raised by the Debtor in the Amended Complaint in the proceeding in issue. *Mourning,* the health spa cases, and the auto sales cases cited above were all TILA cases. The gross mis-statement of the amount financed and the finance charge is, under the direct authority of many of those cases, clearly a violation of the TILA giving rise to a statutory penalty of $1,000.00. *See* 15 U.S.C. §§ 1638(a)(2), (a)(3), 1640(a)(3). The APR computed on the "true" basis of a transaction reflecting a finance charge of $1,640.94 and an amount financed of $984.90, computes to an APR of over eighty (80%) percent in the transaction rather than the eighteen (18%) percent APR disclosed. *See* 15 U.S.C. §§ 1638(a)(4), 1640(a)(3). Furthermore, the failure to disclose an excess finance charge of $1,343.99 which we hold was actually imposed in the transaction gives rise to an additional claim for actual damages in that amount under 15 U.S.C. § 1640(a)(1). *See Russell, supra,* 72 B.R. at 861–64. Thus, TILA liability of $2,343.99 attaches. In addition, costs and attorney's fees must be provided to the Debtor's counsel pursuant to 15 U.S.C. § 1640(a)(3).

With respect to the GSISA, the actual "service charge" is clearly in excess of the eighteen (18%) percent APR maximum rate allowed in that statute. Although the Pennsylvania consumer credit laws are notable for their absence of remedies, *see Russell, supra,* 72 B.R. at 871, the GSISA does contain a provision barring collection of any finance charges imposed in the transaction if that Act has been violated in the transaction. 69 P.S. § 2202. However, it is difficult to measure the damages under § 2202, since this would oblige us to determine how much of the $437.64 paid by the Debtor was attributable to finance charges. We believe that the most reasonable way to determine this is to divide the actual finance charges ($1,640.94) by the total of payments ($2,625.24) to determine the percentage of the payments made which was actually attributable to finance charges (62.53 percent), and multiply this percentage by the payments made ($437.64). The resulting figure is $273.66.[4]

The Debtor also argues that 69 P.S. § 2204 is applicable. This provision of the GSISA states that, in a transaction within the scope of Article VIII, 69 P.S. §§ 1801–06, pertaining to "add-on sales," a recovery of three times the total finance charges is allowed to the buyer in the event of a willful imposition, computation, or disclosure of excess finance charges. However, despite the Debtor's attempt to argue the point in the affirmative, clearly this is not an "add-on sale." All of the goods were purchased in one single retail installment contract, even though the contract contemplated a purchase of at least two consumer items, the TV and the VCR (and possibly also a TV antenna) at once. Therefore, the Debtor is limited to damages of $273.66 arising from 69 P.S. § 2202 which is based on claims under the GSISA itself.[5]

**4.** The Debtor suggests that our finding in *Russell,* 72 B.R. at 870, that all of the payments by the Debtor were "excess interest" should be applied here to conclude that all of the Debtor's payments should be attributable to finance charges. However, there, we were not dealing with 69 P.S. § 2202. The creditor there asserted, in its Proof of Claim in this bankruptcy court, that a principal balance in excess of the actual original principal of the loan was due.

Therefore, we assumed that all of the debtor's payments were attributable to interest. Here, no proof of claim has been filed, and we are uncertain what principal balance is claimed by the Finance Company. The reasoning in *Russell* on this point is therefore inapplicable.

**5.** We note that the Debtor mis-computed the damages due under § 2204, assuming *arguendo* that it did apply. That section allows three

The Debtor also claims damages of three times the excess interest charged pursuant to 41 P.S. § 502 of Act 6. The difficulty with this claim is, again, in ascertaining how much of the Debtor's payments are attributable to *"excess* interest." We previously concluded that $273.66 of the payments made can be attributed to interest. However, permissible finance charges ranged from $262.40 to $296.95, and thus apparently the legally permissible finance charges exceed the amount attributable to finance charges actually paid by the Debtor in connection with the contract in issue. We therefore conclude that the Debtor does not, in this particular fact-setting, state a claim for damages under Act 6.

However, we are compelled to observe that the principal argument made by the Finance Company on this point is without merit. By recitation of cases cited to Pennsylvania usury laws which preceded Act 6, *e.g., Bartholomew v. Northampton National Bank,* 584 F.2d 1288, 1295 & n. 11 (3d Cir.1978), the Finance Company extracts the principle that Pennsylvania usury statutes, including their present form represented by Act 6, do not apply to sales of goods, as opposed to loans. We note, however, that 41 P.S. § 502 expressly applies to any *"loan or use of money"* which is "provided for by this act *or otherwise by law"* (emphasis added). *See Skolnick v. Ford Motor Credit Co.,* 319 Pa.Super. 83, 89· n. 5, 465 A.2d 1064, 1067 n. 5 (1983), *appeal dismissed,* 505 Pa. 608, 482 A.2d 1275 (1984) (Act 6 applies in case challenging overcharges of finance charges in motor vehicle sales finance transaction).

■ The Debtor has more success in his invocation of UDAP, asserting therein that he is entitled to treble his actual damages pursuant to 73 P.S. § 201–9.2(a), measured by three times the $1,343.99 increment which he was obliged to pay in excess of the properly-allowable finance charges, or $4,031.97. We agree that such liability attaches. In *Russell, supra,* 72 B.R. at 871, we held that a violation of any of the Pennsylvania consumer protection laws, in-

cluding the GSISA, was, *per se,* an unfair trade practice violative of UDAP. *Cf. In re Andrews,* 78 B.R. 78, 82–85 (Bankr.E.D. Pa.1987) (any illegal act by a lender within the scope of UDAP is subject to damages under § 201–9.2(a)). Treble damages are justified here, because we find the conduct of the Seller and the Finance Company to have both engaged in conduct resulting in a most unconscionable variety of consumer fraud. *See* pages 882–886 *supra.* Therefore, damages of $4,031.97 are chargeable to both Defendants under UDAP. In addition, the Debtor is entitled to reasonable attorney's fees as an aspect of damages under § 201–9.2(a). *See Andrews,* 78 B.R. at 85; *In re Jungkurth,* 74 B.R. 323, 336 (Bankr.E.D.Pa.1987), *aff'd,* 87 B.R. 333 (E.D.Pa.1988); and *Russell, supra,* 72 B.R. at 873.

■ Therefore, putting aside any limitations arising from other factors in this case, the Defendants would have potential liability of $2,343.99, plus $273.66, plus $4,031.97, or the tidy sum of $6,649.62 as a result of their attempt to impose "hidden finance charges." Had the Debtor paid more on the contract, this figure would be enhanced by damages under GSISA and even Act 6. Thus, we have indeed advanced to the state that the tactics documented by Caplovitz and Magnuson and Carper can indeed be severely penalized when uncovered.

3. THE DAMAGES OF SELLER ARE LIMITED TO $2,500.00 BY THE PARTIES' STIPULATION AND THE DAMAGES OF THE FINANCE COMPANY ARE LIMITED TO $437.64 BY THE TERMS OF 16 C.F.R. § 433.2, ALTHOUGH WE DEEM THEM LIABLE, JOINTLY AND SEVERALLY, FOR THE DEBTOR'S COSTS AND ATTORNEY'S FEES

From the foregoing discussion, it can clearly be seen that the damages for which the Seller would otherwise be liable would greatly exceed the $2,500.00 which he wise-

---

times the *entire* finance charge (here $1,640.94), not the *excess* finance charge of $1,343.99.

Therefore, if applicable, the damages under § 2204 would have been $4,922.82.

ly agreed to pay to the Debtor in satisfaction of all of the liability which would otherwise attach.

However, this resolution does not impact on the liability of the Finance Company. The settlement of the Debtor's claim against the Finance Company, even assuming that it is a joint tort-feasor with the Seller, does not, in the absence of a release specifically so providing, discharge the Finance Company, but merely reduces the Debtor's claim against it in the amount of the consideration of $2,500.00 paid by the Seller. *See* 42 Pa.C.S.A. § 8326; *Frank v. Volkswagenwerk, A.G. of W. Germany,* 522 F.2d 321, 324–28 (3d Cir.1975); and *Littles v. Lieberman,* 90 B.R. 700, 711–12 (E.D.Pa.1988). This will not effect a great reduction, as the total damages to which the Debtor could be entitled would be $6,649.62.

However, we believe that the Finance Company has a firm basis for its argument that its liability is rather substantially reduced by the express terms of the parties' contract, given the limitations in the language of the appendage establishing assignee liability required by both 16 C.F.R. § 433.2 and 69 P.S. § 1402. Those provisions expressly limit the liability of a holder-assignee to the "amounts paid by the debtor hereunder." While allowing the Debtor to assert affirmative claims against the Finance Company, *see Eachen v. Scott Housing Systems, Inc.,* 630 F.Supp. 162, 164–65 (M.D.Ala.1986), the purpose of this language is clearly to "not permit a consumer to recover more than he has paid ...". M. Smith, *Preserving Consumers' Claims and Defenses,* 63 A.B.A.J. 1400, 1402 (1977). *See also* 40 FED.REG. 53506, 53527 ("Consumers will not be in a position to receive an affirmative recovery from a creditor, ... [except] a refund of monies paid on account"); and Comment, *Preser-*

*vation of Consumer Claims and Defenses: Miller's Tale Tolled by FTC (Or Is It?),* 47 MISS.L.J. 768, 775 (1976).

The effect of the "preservation of defenses" language is sufficient to wipe out the potential claim of the Finance Company that its TILA liability is limited, by the terms of 15 U.S.C. § 1641(a), to a violation which "is apparent on the face of the disclosure statement." *See Cox v. First National Bank of Cincinnati,* 633 F.Supp. 236, 239 (S.D.Ohio 1986). *Cf. In re Pinder,* 83 B.R. 905, 911–12 (Bankr.E.D.Pa.1988) (exemption of creditor from liability does not shield assignee from liability under § 1641(a)).

However, on the other hand, this language appears to directly limit the liability of the Finance company to the relatively-modest sum paid by the Debtor, i.e., $437.74.[6] Of course, the Finance Company may be able to recover reimbursement of this sum from the Seller, if it is able to prove that he breached any aspect of those parties' assignment contract. However, since we find the Finance Company far more deeply implicated in the Seller's exploitive tactics than it claims, our sympathies for it are, in any event, not immense. Moreover, because the underlying transaction is significantly tainted due to the violations of TILA, the GSISA, and UDAP which pervade it, we believe that we must proceed to invalidate the Finance Company's security interest in the Debtor's TV and VCR, which was acquired only as the result of a grossly tainted transaction, and was not deemed of sufficient value to the Finance Company to elicit a Proof of Claim from it. *Compare Fleet, supra,* slip op. at 336–337 (transaction fraught with unconscionable trade practices entitles consumers to recovery of all amounts paid, without consideration of any benefits re-

6. We can conceive of a potential basis on which the Debtor could have possibly, but did not, argue that the Finance Company is liable for more than the $437.64 sum. In several TILA cases, courts have determined that parties who are nominally assignees are in fact creditors and liable in the same fashion as direct parties to the contract. *See, e.g., Joseph, supra,* 532 F.2d at 91–93; *Kriger, supra,* 363 F.Supp. at

335–36, 338; and *Trustees Loan & Discount Co. v. Carswell,* 435 So.2d 114, 117 (Ala.Civ.App. 1983). However, despite two opportunities to do so, the debtor has not pleaded, nor has he undertaken to prove or argue, liability of the Finance Company on this basis. His Brief is replete with reference to the "preservation of defenses" clause as his sole asserted basis for the Finance Company's liability.

ceived in the transaction by the consumers). We also believe that, in light of the nominal damages imposed upon the Finance Company by our ultimate Order, it had little practical reason to protest this mild consequence of its actions.

Two of the statutes violated by both Defendants provide that a successful party may recover costs and attorney's fees from the Defendants, § 1640(a)(3) of the TILA and 73 P.S. § 201–9.2(a) of UDAP. Since the liability of both parties could quite clearly have been far greater, we have no hesitancy in ordering that these parties are jointly and severally liable therefor.

## E. CONCLUSION

We will proceed to enter an Order of record consistent with the results reached by us in this Opinion. We hope to thereby shed some light to the dark side of the marketplace and place at least some checks on the amount in excess of that which members of our society more affluent than the poor must pay for consumer goods.

## ORDER

AND NOW, this 8th day of December, 1988, after a trial of this proceeding on June 23, 1988, and upon consideration of the submissions of the parties thereafter, it is hereby ORDERED as follows:

1. Judgment is entered in favor of the Plaintiff, ALFRED STEWART, and against the Defendant, LOUIS ABRAHAMSEN, t/a CENTURY CARPET & CONTRACTORS, in the amount of $6,649.62. However, this judgment will be satisfied upon the payment of $2,500.00 by the said Defendant to the Standing Chapter Trustee in accordance with the parties' Stipulation of October 31, 1988.

2. Judgment is entered in favor of the Plaintiff, ALFRED STEWART, and against Defendant, CREDITHRIFT OF AMERICA CONSUMER DISCOUNT COMPANY, INC., in the amount of $437.64.

3. The security interest of the Defendant, CREDITHRIFT OF AMERICA CONSUMER DISCOUNT CO., INC., in the

Debtor's TV and VCR is declared INVALID.

4. The aforesaid Defendants shall pay all sums due under the terms of this Order to the Standing Chapter 13 Trustee, Edward Sparkman, Esquire. The said Trustee shall determine whether this sum may be claimed as part of the Debtor's exemptions, and, if it may be, he shall forward this sum to the Debtor forthwith.

5. The Defendants are jointly and severally liable to pay reasonable attorney's fees and costs to the Debtor's counsel. The parties are urged to attempt to agree upon reasonable attorney's fees and costs which are due to the Debtor's counsel, per 15 U.S.C. § 1640(a)(3). If this matter is not resolved within fifteen (15) days, the Debtor's counsel shall, within thirty (30) days of this Order, file a Motion requesting such fees, said Motion to be procedurally in conformity with *In re Meade Land and Development Co., Inc.*, 527 F.2d 280 (3d Cir. 1975); and *In re Mayflower Associates*, 78 B.R. 41 (Bankr.E.D.Pa.1987). However, if the Debtor's counsel remit a reasonable request for such fees, which is refused, the said counsel may recover compensation for time spent on the fee application as well.