Doris M. SHEPEARD, Plaintiff,

v.

QUALITY SIDING & WINDOW FACTO-
RY, INC., and Union Mortgage
Company, Inc., Defendants.

Civ. A. No. 89–162–JLL.

United States District Court,
D. Delaware.

Feb. 13, 1990.

Sandra E. Messick of UAW Legal Services Plan, Newark, Del., for plaintiff.

Judith N. Renzulli of Duane, Morris & Heckscher, Wilmington, Del., for defendant, Quality Siding & Window Factory, Inc.

Jane W. Evans and Jeffrey M. Boyer of Evans and Evans, Wilmington, Del., for defendant, Union Mortg. Co., Inc.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

Plaintiff, Doris M. Shepeard ("Shepeard"), contracted with defendant, Quality Siding & Window Factory, Inc. ("Quality Siding"), for siding and other home improvement work. Shepeard claims that Quality Siding and co-defendant Union Mortgage Company, Inc. ("Union Mortgage"), to which Shepeard's mortgage was later assigned, failed to comply with the disclosure requirements and rescission provisions of the federal Truth in Lending Act ("TILA" or "the Act"), 15 U.S.C. § 1601 *et seq.*, and Regulation Z, 12 C.F.R. pt. 226, promulgated thereunder. Both Quality Siding and Union Mortgage deny the allegations. Each defendant has filed a cross-claim denying it is liable, and contending any violations are due to the fault of the other. Shepeard now moves for summary judgment. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## FACTS

Quality Siding is a New Jersey corporation engaged in the business of selling and installing siding for residential properties. On April 5, 1988, Quality Siding and plaintiff Shepeard entered into a Cash Memorandum Agreement ("Cash Agreement"), which provided that Quality Siding would perform certain home improvement work on Shepeard's residence. Quality Siding does not deny that the agreement made on that date embodied a consumer credit transaction subject to the provisions of the TILA and Regulation Z. (*See* D.I. 8 at ¶¶ 6, 7.)

The copies of the Cash Agreement produced by both Shepeard and Quality Siding [1] contain a detailed description of the siding work that was to be done, and disclose several terms of the financing arrangement agreed upon by the parties. The cash price of the siding job is listed as $12,995.00. The other relevant items included in the Cash Agreement relate to the financing terms. Monthly payments are

---

1. These copies are identical. (*Compare* Exhibit A, D.I. 21 at B–5 [Quality Siding's copy of the Cash Agreement] *with* D.I. 17A at A–4 [Shepeard's copy].)

listed as "$App *199* [sic] per month for 120 months...."[2] (Ex. A, D.I. 21 at B–5; D.I. 17A at A–4.) The Cash Agreement also states that the first payment was "to be made 60 days after completion of [the siding] ... work." (*Id.*) The siding work was to "begin approximately 1 wk [sic] work [sic] to be completed by approximately 4–5 wks [sic]." (*Id.*) Directly below these financing terms are five disclosure boxes. These boxes are labeled, respectively, as follows: annual percentage rate, finance charge, amount financed, total of payments, and total sale price. None of these boxes is filled in. (*See id.*)

After entering the Cash Agreement, Quality Siding sought to obtain bank financing for Shepeard. The Cash Agreement specifies that it was to be considered "accepted subject to approval of Contractor [i.e., Quality Siding] and Credit Approval." After unsuccessfully attempting to arrange financing with "at least 2 banks," Quality Siding was finally able, on or about April 19, 1988, to obtain credit for Shepeard from co-defendant Union Mortgage. (Affidavit of Holly Lauria [President of Quality Siding], D.I. 21 at B–2, ¶ 4.) Union Mortgage is a Texas corporation engaged in the business of making loans to consumers and taking assignments of loans from other organizations.

According to Quality Siding, shortly after receiving this credit approval, on or about April 21 or 22, 1988, its representatives met with Shepeard to discuss some additional documents she needed to sign. (*Id.* at B–2, ¶ 5.) These other documents, which included the Lien Contract and a mortgage on Shepeard's home, were dated April 5, 1988, but were not actually signed until April 21 or 22, 1988.[3] (*Id.* at B–3, ¶ 5.) Copies of these documents were later mailed to Shepeard. Quality Siding estimates that Shepeard should have received her copies on or about April 24, 1988, but certainly before any work was actually begun on her property.[4] (*Id.* at B–3, ¶ 6.)

The Lien Contract contained numerous required disclosures, including the annual percentage rate, the finance charge, the amount financed, the total of payments, and the total sale price. With regard to the required payment scheduling information, the Contract stated that the number of payments would be 120, and the amount of each payment $234.06. The disclosure boxes labeled "When Payments Are Due" and "Monthly starting" were left blank. According to Quality Siding, the latter information was not then disclosed, pursuant to "instructions provided by Union Mortgage," because "the due date and the date of first payment ... were contingent upon completion of the work." (*Id.* at B–3, ¶ 7.)

At some point after the mortgage papers were signed, Quality Siding assigned all of the documents to Union Mortgage. Shepeard signed a Completion Certificate, certifying all of the work had been done on her home, on May 24, 1988. Thereafter, in July of 1988, Shepeard had two telephone conversations with a Union Mortgage representative, during which time Shepeard's payment schedule was discussed. During the second conversation on July 13, 1988, Shepeard agreed to make her payments by the second day of each month, beginning that September. (D.I. 22A at C–5.) Subsequently, Union Mortgage assigned the mortgage and underlying documents to Avco Financial Services of West Wilmington, Inc. ("Avco").[5] Shepeard made her first payment to Union Mortgage. For the months of October 1988 through April 1989, Shepeard made payments to Avco.

---

2. The underlining indicates that those figures or letters were handwritten into blank spaces in the Cash Agreement.

3. Shepeard maintains the Lien Contract was not signed until May 24, 1988. Because the Court's conclusions would be the same regardless of when the Lien Contract was actually signed, this factual dispute is not material. *See infra* pp. 1300–01.

4. Shepeard maintains that she did not receive a copy of the Lien Contract until May 24, 1988, the date she also claims the document was signed. *See supra* note 3. However, the date Shepeard actually received her copy of the Lien Contract is, like the date it was signed, not material in this case. *See infra* pp. 1300–01.

5. Avco is not a party to this action.

On March 8, 1989, Shepeard attempted to rescind the transaction through a letter from her attorney addressed to Quality Siding. Neither Quality Siding nor Union Mortgage took any action in response to the rescission notice. In late April or early May of 1989, Avco reassigned the Shepeard mortgage to Union. To this day, the mortgage held on Shepeard's property has not been marked satisfied, and the payments made by Shepeard have not been refunded.

Shepeard filed this suit on April 5, 1989, and moved for summary judgment on November 14, 1989. Discovery is complete, and all briefs on the motion have been filed.

## DISCUSSION

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). "The party moving for summary judgment has the burden of proving that no genuine issues exist as to any material fact.... The court must, however, construe all of the evidence in the record in the light most favorable to the nonmoving party." *Miller v. Eichleay Engineers, Inc.*, 886 F.2d 30, 35–36 (3d Cir.1989) (citations omitted).

The nonmoving party, here defendants, need only demonstrate the existence of a genuine issue of material fact in order to defeat a summary judgment motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–510, 91 L.Ed.2d 202 (1986). Material facts include only those "facts that might affect the outcome of the suit under the [applicable] governing law...." *Id.* at 248, 106 S.Ct. at 2510.

Shepeard contends there is no genuine issue of material fact. Thus, she moves now for summary judgment. Having considered the parties' written submissions and having heard oral argument on February 9, 1990, the Court rules on Shepeard's motion as set forth below.

## I. Plaintiff's Husband As An Indispensable Party

■ As an initial matter, the Court would like to dispose of the argument, presented in Union Mortgage's summary judgment responding brief, that Shepeard's complaint should be dismissed for failure to join an indispensable party, namely Shepeard's husband. The Court concludes that Shepeard's husband is not a necessary party within the meaning of Rule 19 of the Federal Rules of Civil Procedure. Other courts have similarly concluded that joint obligors are not indispensable parties under Rule 19 in TILA cases. *See, e.g., Aldrich v. Upstate Auto Wholesale of Ithaca, Inc.*, 564 F.Supp. 390, 392 (N.D.N.Y.1982).

Rule 19, which controls the joinder of so-called indispensable parties, provides that a person shall be joined as a party if, first, "in the person's absence complete relief cannot be accorded among those already parties." Fed.R.Civ.P. 19(a)(1). Union Mortgage does not allege that this subsection applies. Nor does the Court believe it is applicable. Rule 19 also provides that a person should be joined if he

> claims an interest relating to the subject of the action and ... disposition of the action in the person's absence may ... impede the person's ability to protect that interest or ... leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a)(2).

As Shepeard points out, she is sole owner of the residence that was pledged as security in the siding transaction at issue here. (*See* D.I. 24A at A–27.) Regulation Z states that "each consumer *whose ownership interest is or will be subject to the security interest* [pledged] shall have the right to rescind the transaction...." 12 C.F.R. § 226.23(a) (emphasis added). Thus, her husband arguably does not even have a right to rescind, and therefore no Rule 19 interest in the rescission portion of this lawsuit. Moreover, there is no reason to believe that not joining Shepeard's husband as a party would impede his ability to pro-

tect any interest he may have in any possible recovery for the alleged disclosure violations. Certainly, defendants have not offered any possible reason.

Another important point is that defendants are not at all prejudiced by the Court's finding that Mr. Shepeard is not a necessary party. The Act limits recovery for multiple failures to disclose in a single credit transaction. *Id.; see* 15 U.S.C. § 1640(d). That is, despite the number of obligors or the number of disclosure violations, a creditor can only be liable for one statutory penalty for failure to disclose per transaction. Thus, Union Mortgage would not be exposed to further liability or, in the words of Rule 19, any "inconsistent obligations" just because Mr. Shepeard is not joined as a party.

## II. The Alleged Disclosure Violations

Shepeard claims defendants violated federal disclosure requirements in several ways. First, Shepeard argues that the failure to disclose the schedule of payments and the starting date for payment violates the Act. Next, she argues that defendants' failure to disclose in the Cash Agreement that they were taking a security interest in her home is another violation. Shepeard also charges that the Lien Contract was not signed until after completion of work on her home; and lastly, she points out that when the Cash Agreement was signed, the federal disclosure boxes were left blank. (*See* D.I. 17 at 14.)

Defendant Quality Siding admits that the Cash Agreement and Lien Contract did not state the starting date and schedule for payment. But it relies upon one of the applicable regulations which provides that, when any information necessary for an accurate disclosure is unknown, a creditor may make disclosures that are estimates, so long as they are based on the best information that is reasonably available to the creditor. Thus, Quality Siding argues that its partial disclosure was justified because, due to the nature of the contract, plaintiff's obligation to begin payments for the home improvements was conditioned upon satisfactory completion of the job.

Quality Siding contends that under the circumstances its disclosure was as complete and specific as possible: The Cash Agreement noted that payments would be made for a term of 120 months and that the initial payment was due 60 days from completion of the job, which was estimated to start within one week and take four to five weeks to complete. Finally, Quality Siding maintains that plaintiff received copies of all documents *before* any work was begun on her home.

Co-defendant Union Mortgage makes numerous arguments regarding why its liability is limited by its status as an assignee. Moreover, like Quality Siding, it also argues that the Cash Agreement provided estimates (regarding the schedule for payments and initial payment due date) that satisfied the disclosure requirements imposed by the Act and applicable regulations.

### a. Disclosure Requirements Of The Truth In Lending Act

The purpose of the Truth in Lending Act is "primarily to aid the unsophisticated consumer so that he … [is not] easily misled as to the total costs of financing." *Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 248 (3d Cir.1980). To achieve this goal the Act requires creditors to disclose certain information in writing and in a particular manner. TILA requirements are enforced by imposing a sort of strict liability in favor of consumers who have secured financing through transactions not in compliance with the terms of the Act. *Id.* "It is strict liability in the sense that absolute compliance is required and even technical violations will form the basis for liability." *In re McElvany*, 98 B.R. 237, 240 (Bankr. W.D.Pa.1989) (citation omitted). To recover under the Act a consumer need not prove, or even allege, she was actually deceived or injured by a creditor's failure to comply with TILA requirements. *Thomka*, 619 F.2d at 250 (citing *Dzadovsky v. Lyons Ford Sales, Inc.*, 593 F.2d 538, 539 (3d Cir.1979)). Moreover, it is well established that, as a remedial statute, the TILA

should be liberally construed in favor of borrowers.

All three parties acknowledge that the Act and regulations require disclosure of payment scheduling information. The Truth in Lending Act states that the creditor shall disclose, *inter alia*, "the number, amount, and due dates or period of payments scheduled to repay the total of payments." 15 U.S.C. § 1638(a)(6). Regulation Z, which implements the Act, similarly provides that "the creditor shall disclose ... (g) Payment Schedule. The number, amounts, and timing of payments scheduled to repay the obligation." 12 C.F.R. § 226.18(g).

It also seems clear that disclosures may be based on estimates. Regulation Z specifically provides that "if any information necessary for an accurate disclosure is unknown to the creditor, it shall make the disclosure based on the best information reasonably available and shall state that the disclosure is an estimate." 12 C.F.R. § 226.17(c)(2). If these estimates later turn out to be inaccurate because of events that occur after the creditor has provided the required disclosures, such an inaccuracy would not amount to a violation of the Truth in Lending regulations. *See* 12 C.F.R. § 226.17(e).

The TILA requires that disclosures be made before "credit is extended" to the consumer. 15 U.S.C. § 1638(b)(1). The regulations define "credit" as "the right to defer payment of debt or to incur debt and defer its payment." 12 C.F.R. § 226.2(a)(14). The regulations also give meaning to the phrase when "credit is extended." That is, the required disclosures must be made *"before consummation* of the transaction." 12 C.F.R. § 226.17(b) (emphasis added). A transaction is consummated at "the time the consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13). Disclosures must be made in writing, and the consumer must receive a copy of the written disclosures. 12 C.F.R. § 226.17(a)(1).

### b. Liability For Disclosure Violations

The siding transaction at issue in this case involved two different contracts: the Cash Agreement signed before work on plaintiff's home began, and the Lien Contract, which was signed later on and noted the security interest taken in plaintiff's home. Shepeard has produced a copy of the Cash Agreement which not only lacks the exact payment scheduling information as discussed above, but also contains federal disclosure boxes (for other required information) that are completely blank. (*See* D.I. 17A at A–4.) The Agreement is, however, signed by a representative of Quality Siding and by plaintiff and her husband. Defendant Quality Siding has produced an *exact copy* of the signed Cash Agreement provided by plaintiff. The payment scheduling information is in fact "estimated" as argued by defendants. More important, however, is the fact that none of the federal disclosure boxes are filled in.

Defendants do not even address Shepeard's remarks regarding the blank federal disclosure boxes in the Cash Agreement. Perhaps this is because they believe the Agreement did not have to comply with TILA disclosure requirements. On the other hand, defendants rely on the Cash Agreement to evidence proper, written disclosure of a reasonable estimate of the payment schedule information they were required to provide.

Defendants cannot have it both ways. That is, they cannot expect this Court to accept the estimated payment schedule information contained in the Cash Agreement as adequate disclosure, and then find that the transaction was not consummated until later when the Lien Contract was signed. The so-called "estimates" were provided *only* in the Cash Agreement. It is undisputed that both the "When Payments are Due" and "Monthly starting" boxes were left blank when the Lien Contract was signed. (*See* D.I. 21 at B–7; D.I. 22A at C–2.) If the Cash Agreement did not need to contain the other required disclosures because the transaction was not consummated until the Lien Contract was signed, then the payment schedule (or the

"estimated" schedule) should also have been disclosed in the Lien Contract.

█ Regulation Z clearly provides that the required disclosures "shall be *grouped together*, shall be *segregated from everything else*, and shall not contain any information not directly related to the disclosures required under § 226.18." 12 C.F.R. § 226.17(a) (footnotes omitted) (emphasis added). Thus, if the transaction was consummated, for purposes of TILA disclosure requirements, when the Cash Agreement was signed, Quality Siding failed to make numerous material disclosures, including the finance charge and annual percentage rate. (*See* Exhibit A, D.I. 21 at B–5.) If the transaction was not consummated until later when the Lien Contract was signed, then Quality Siding still violated the Act by failing to disclose the payment schedule [6] (or, at least, the estimated version [7]).

█ All parties agree that Union Mortgage is liable only as an assignee of Quality Siding. (*Cf.* D.I. 24 at 7.) Under the Act, assignees are liable [8]

6. On February 8, 1990, the Court received a letter from counsel for defendant Union Mortgage. In this letter Union Mortgage asserted an alternative theory for why the disclosures in the Lien Contract were adequate. Because this letter was sent to the Court over one month after the already twice extended briefing period had elapsed, and in violation of Local Civil Rule 3.1E, the Court will not address this argument. It is sufficient to note, however, that the defense appears to have no merit, at least on the facts of this case.

Union Mortgage essentially argued that TILA requirements for disclosure of the payment schedule permit a creditor to state merely that payments will be made on a monthly basis, and that therefore omission of the "Monthly Starting" and "When Payments Are Due" information did not violate the Act. Union Mortgage contended that this is the logical reading of the disjunctive in the statute: "The number, amount, and *due dates or period of payments* scheduled to repay the total of payments." 15 U.S.C. § 1638(a)(6) (emphasis added).

Briefly stated, the Court would reject such an argument for several reasons. First, such a reading of the statute would mean that consumers would not be entitled to know when their monthly payments were to begin (and, hence, end), a result completely at odds with the purposes of the Act. Without giving at least a starting date, the term "monthly" simply does not provide sufficient notice of the "period of payments scheduled to repay the total of payments."

Lastly, although the two district court cases cited by Union Mortgage do hold otherwise, those cases are both unpersuasive and distinguishable. Here, the Lien Contract contained the bare, pre-printed words "Monthly Starting" and a blank space that was not filled in. It could appear to a reasonable person that this section was not even applicable. By contrast, in the cases cited by Union Mortgage, the term "monthly" appeared in provisions that explicitly stated the number of payments and that they were to be paid in "consecutive monthly installments" of a certain amount, on the same day of the month each month after the first payment.

*See Alvarez v. Galassi AMC–Jeep, Inc.,* No. 78 C 3802, slip op. at 6 (N.D.Ill. July 9, 1979); *In re Black,* 411 F.Supp. 749, 750 (S.D.Ohio 1975). Thus, at the very least, the "monthly" term was clearly applicable to the particular consumer.

7. Because of the outcome in this case, the Court need not reach the issue of whether the estimated payment schedule in the Cash Agreement did in fact satisfy 12 C.F.R. § 226.17(c)'s requirements for the use of estimates.

8. Union Mortgage has interposed a contractual defense to any assignee liability that might otherwise be applicable under the Act. According to Union, its liability is limited by language in the Lien Contract that provides, in accordance with FTC rules, that a consumer's rights against the seller are preserved against any subsequent holder of the contract, but recovery by the consumer against any such holder (here that would be Union) is limited to the amounts paid by the consumer under the contract. (*See* Exhibit B, D.I. 22A at C–2.) It is clear that absent such a defense, Union Mortgage is liable as an assignee. *See infra* pp. 1301–02, 1305. Therefore, the only question presented by such a defense is whether the TILA scheme for imposing liability on assignees was meant to be limited by the so-called FTC holder rule. *See* 16 C.F.R. § 433.2. Although in the case relied on by Union Mortgage the assignee's liability was in fact limited because the FTC holder language was present in the contract, *see In re Stewart,* 93 B.R. 878, 888 (Bankr.E.D.Pa.1988), the Court declines to follow the reasoning in *Stewart.*

The purpose of the FTC regulation that requires consumer credit contracts to include the preservation of defenses language at issue here is to protect the consumer, not the creditor-assignee. *See, e.g., Armstrong v. Edelson,* 718 F.Supp. 1372, 1379 (N.D.Ill.1989). Therefore, it would seem unlikely that this contractual language should, or even could, override the assignee liability provisions of the TILA.

As will become apparent, *see infra* pp. 1302, 1303–1305, Union Mortgage itself violated the Act in two different ways. It voluntarily took assignment of a contract that on its face was not

only if the [TILA] violation ... is *apparent on the face of the disclosure statement* .... For the purpose of this section, a violation apparent on the face of the disclosure statement includes, but is not limited to (1) *a disclosure which can be determined to be incomplete* or inaccurate from the face of the disclosure statement or other documents assigned, or (2) a disclosure which does not use the terms required to be used by this subchapter.

15 U.S.C. § 1641(a) (emphasis added).

Both the Cash Agreement and Lien Contract produced by Union Mortgage [9] reflect that TILA requirements were not satisfied. The Cash Agreement produced by Union Mortgage (*see* Exhibit A, D.I. 22A at C–1) does not state the amount of plaintiff's monthly payments. The Act requires that this figure, which is not even estimated on Union Mortgage's copy, be disclosed along with the other required payment schedule information. *See* 12 C.F.R. § 226.18(g). There is no doubt that this omission was apparent on the face of the Agreement because the document contains a blank space specifically for this information, and that space was filled in only with the notation "App" and no numbers or dollar amount.

A second reason why Union Mortgage could not have relied on the Cash Agreement as evidencing proper disclosure is that the entire section entitled "Collateral" is not filled in. That is, the box which

indicates that the financing was *not* to be secured by any collateral is blank. (*See* Exhibit A, D.I. 22A at C–1.) Similarly, the spaces for indicating that a security agreement for collateral or a mortgage *would* be executed are also blank. (*See id.*) Regulation Z requires disclosure of "[t]he fact that the creditor has or will acquire a security interest in the property purchased as part of the transaction, or in other property...." 12 C.F.R. § 226.18(m). Union Mortgage, coming in as an assignee of the Shepeard mortgage, had to know this transaction involved retention of a security interest, a fact which must be disclosed to the consumer. Thus, Union Mortgage could not possibly have relied on the Cash Agreement as evidencing compliance with TILA requirements.

Union Mortgage could also not have relied on the Lien Contract as proof of disclosure. Its copy of that document, like Quality Siding's and Shepeard's, contains blank spaces underneath the "When Payments Are Due" and "Monthly starting" boxes. (*See* Exhibit B, D.I. 22A at C–2.) In sum, because the TILA violations were readily apparent, Union Mortgage is also liable for the TILA disclosure violations in this transaction.[10]

### III. The Alleged Rescission Violations

In a transaction such as this, through which a creditor retains a security interest in the consumer's principal dwelling, the Truth in Lending Act gives consumers an

---

in compliance with TILA requirements, and then, after receiving Shepeard's notice, it deliberately chose not to carry out its rescission duties under the Act. These are independent violations of the statute committed by Union Mortgage. The FTC language cannot be read to limit Shepeard's recovery for these violations because the effect would be to allow assignees to limit contractually a consumer's TILA remedies. But Congress has already determined, in the Act itself, the extent to which a consumer may recover against an assignee.

Whether or not an assignee may rely on the FTC language to limit a consumer's recovery *when the preservation of defenses language is itself the basis for holding the assignee liable* is another matter, and the Court expresses no opinion on that question. Here, it is sufficient merely to note that the basis for liability was not the contract's language, but Union Mort-

gage's independent violations of the Act and the TILA's statutory imposition of liability on assignees.

9. Union Mortgage's copy of the Cash Agreement contains more disclosures than the version produced by Quality Siding and Shepeard. Nevertheless, this discrepancy is not material. Because it was apparent on the face of its version of these documents that at least some of the required disclosures were not made, Union Mortgage is liable.

10. In light of this finding, the Court need not address plaintiff's argument that the preservation of defenses language in the Lien Contract exposes Union Mortgage to additional liability for TILA violations which were *not apparent* on the face of the disclosure statement. (*See* D.I. 24 at 8–9.)

unqualified right to rescind for up to three days after the transaction is consummated. *See* 12 C.F.R. § 226.23(a)(3). The purpose of this right to rescind is to protect consumers "from having their homes placed in jeopardy by the operation of the security interest provisions of a credit transaction." *Abele v. Mid–Penn Consumer Discount,* 77 B.R. 460, 467 (E.D.Pa.1987) (citations omitted), *aff'd without opinion,* 845 F.2d 1009 (3d Cir.1988). If certain information is not provided to the consumer, her right of rescission may be extended for up to three years. When a consumer has exercised her right to rescind, "[s]he is not liable for any finance or other charge, and any security interest given by [her] ... becomes void...." 15 U.S.C. § 1635(b).

### a. Time Limit on Plaintiff's Right To Rescind

■ Both defendants contend that Shepeard's attempt to rescind was untimely. They argue she was only entitled to rescind for three days after the transaction was consummated or all material disclosures were made. Thus, defendants reason Shepeard's attempted rescission came too late because any alleged disclosure violation was not material, and only the failure to provide material disclosures entitles a consumer to the three-year rescission period. Shepeard claims that she has the right to rescind for up to three years because material disclosures were not correctly provided to her at the time "of the original credit transaction." (D.I. 17 at 16.)

All of the parties somewhat misstate the law. A consumer has the right to rescind "until midnight of the third business day following the *consummation of the transaction or* the delivery of the information and rescission forms required under this subchapter together with a statement containing the *material disclosures* required under this subchapter, whichever is later...." 15 U.S.C. § 1635(a) (emphasis added). But regardless of the number or timing of disclosure violations, the right to rescind lasts *at most* three years:

> If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consum-

mation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first.

12 C.F.R. § 226.23(a)(3). Shepeard is thus entitled to the three-year rescission period only if she never received notice of her right to rescind or the pertinent material disclosures.

Shepeard has not claimed that she did not receive the required rescission notice. (*See* D.I. 1; D.I. 17 at 16–20.) She also does not exactly appear to be claiming that she never received all material disclosures. Rather, Shepeard contends the disclosure she received did not comply with TILA requirements, thus entitling her to the three-year rescission period. (*Cf.* D.I. 24 at 11.)

At least for rescission purposes, Regulation Z limits the meaning of the term "material disclosures" to "the annual percentage rate, the finance charge, the amount financed, the total of payments, and the payment schedule." 12 C.F.R. § 226.23(a)(3) n. 48. Shepeard has implicitly conceded she received adequate notice of the finance charge and annual percentage rate. (*Cf.* D.I. 17A at A–1, ¶ (d).) Indeed, Shepeard produced a copy of the Lien Contract, as part of her complaint, that evidences disclosure of these figures, as well as of the amount financed and the total of payments. (*See* Exhibit A, D.I. 1.) Accordingly, the only item that could still justify Shepeard's reliance on the three-year rescission period is the payment schedule.

As stated previously, the payment schedule information section in the Lien Contract produced by Shepeard is only partially filled in. But the defendants have produced uncontroverted evidence indicating that this information was in fact disclosed at some point. Both defendants have produced the transcript of a telephone conversation between plaintiff and a representative of Union Mortgage that took place on July 13, 1988. (D.I. 21 at B–11; D.I. 22A at C–5.) In this conversation Shepeard and the Union Mortgage agent came to a

friendly understanding regarding the payment scheduling information. (*See, e.g., id.* ["(W)e do need to set up your due date. Your first payment is going to be in 30 to 45 days. What's a good day of the month for you to mail your payments out?"].) Therefore, there is no doubt in the Court's mind that the payment schedule information was in fact eventually disclosed.[11]

Shepeard is correct, however, in her argument that *oral* disclosures do not satisfy the Act. Regulation Z mandates that the required disclosures be made "clearly and conspicuously *in writing,* in a form that the consumer may keep." 12 C.F.R. § 226.17(a) (emphasis added); *see also* 15 U.S.C. § 1632(a). As the Third Circuit once noted:

> Regulation Z unequivocally requires that necessary disclosures shall be written and made together on one document. The drafters of the legislation obviously felt that oral statements by creditors of piecemeal disclosures are not adequate to ensure the consumer's protection. *Regardless of the wisdom or validity of that proposition, it is not this Court's prerogative to substitute its own view for that of Congress.*

*Thomka,* 619 F.2d at 250 n. 3 (quoting *Lauletta v. Valley Buick, Inc.,* 421 F.Supp. 1036, 1040 (W.D.Pa.1976)) (emphasis added). No evidence has been offered to show that the payment information was disclosed in any writing other than the initial Cash Agreement. Neither has any allegation been made to that effect. Thus, even though she received both written and oral disclosure of her payment schedule, and this Court concludes that she eventually did have actual knowledge of the schedule, Shepeard is entitled to rely on the three-year rescission period, making her attempt to rescind timely. The Court notes that the Truth in Lending Act was not meant "to apply only to sympathetic consumers ... [but rather] to *all consumers,*

who are inherently at a disadvantage in loan and credit transactions." *Jackson v. Grant,* 890 F.2d 118, 122 (9th Cir.1989) (emphasis added) (citation omitted).

**b. Effectiveness Of Plaintiff's Rescission Notice**

■ Defendant Union Mortgage challenges, on several grounds, the adequacy of plaintiff's notice of rescission. Union Mortgage contends that Shepeard should have "directed" the notice of rescission to Union, not Quality Siding.[12] Union Mortgage further contends that because it had assigned the Shepeard mortgage to Avco, a financial service company not a party to the instant case, Union Mortgage did not have the power to cancel the security interest held on Shepeard's home.

Shepeard claims that she was unaware that Union had assigned her mortgage to Avco, even though she had made payments to Avco.[13] (D.I. 24 at 13.) She also maintains that the Act required only that she notify her original creditor. This is in fact what she did through her attorney's letter of March 8, 1989, which was addressed to Quality Siding and included a "cc" notation that presumably indicates a copy of the letter was also sent to Avco. (*See* D.I. 22A at C–8.)

Union's challenges have no merit. A consumer clearly has the right to "rescind the transaction as against any assignee of the [creditor]." 15 U.S.C. § 1641(c). Regulation Z outlines the manner in which the right to rescind must be exercised: "[T]he consumer shall notify *the creditor* of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered...." 12 C.F.R. § 226.23(a)(2) (emphasis added). The Act itself similarly provides that the consumer has the right to rescind a transaction "by

---

**11.** Shepeard does not deny that the transcript of this conversation is accurate. Indeed, Shepeard made numerous payments in accordance with the payment schedule disclosed during the taped, July 13th conversation. (*See* D.I. 22A at C–6.)

**12.** Interestingly, Union Mortgage does not claim that it did not receive the rescission notice, which was admittedly addressed to Quality Siding.

**13.** Union Mortgage claims that Shepeard was aware of the assignment. (D.I. 22 at 10.)

notifying *the creditor*, in accordance with the regulations of the Board, of his intention to do so." 15 U.S.C. § 1635(a) (emphasis added).

Since it is "the creditor" which is entitled to written notice of rescission, it is useful to examine how this term is defined for TILA purposes. The Act states that the word "creditor"

> refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom *the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness* or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(f) (West Supp.1989) (emphasis added). Regulation Z similarly provides that the creditor is the party "to whom the obligation is *initially payable.*" 12 C.F.R. § 226.2(a)(17)(i). The official commentary to this section [14] is particularly helpful in our case. It states, in pertinent part, the following:

> 2. *Assignees.* If an obligation is initially payable to one person, that person is the creditor even if the obligation by its terms is simultaneously assigned to another person. For example:
>
> An auto dealer and a bank have a business relationship in which the bank supplies the dealer with credit sale contracts that are initially made payable to the dealer and provide for the immediate

assignment of the obligation to the bank. The dealer and purchaser execute the contract only after the bank approves the creditworthiness of the purchaser. *Because the obligation is initially payable on its face to the dealer, the dealer is the only creditor in the transaction.*

12 C.F.R. pt. 226, supp. 1 at 228 (1989) (emphasis added). In light of these explanations of the term, the Court concludes that the "creditor" in this case was Quality Siding, the party which is named in both the Cash Agreement and Lien Contract. (*See* Exhibits A & B, D.I. 21 at B–5–B–8.) This conclusion is supported by the fact that Union Mortgage itself has consistently and adamantly claimed "assignee" and not creditor status throughout this litigation.

Because Union Mortgage was not the creditor, one could conceivably read the TILA rescission provisions as not requiring Shepeard to provide Union with any notice, or at least not with notice that would need to comply with 12 C.F.R. § 226.23(a)(2).[15] But the Court need not reach such an extreme result in this case given that Union Mortgage has flatly admitted that it did in fact receive Shepeard's rescission notice. (*See* D.I. 17A at A–11, ¶ 8.) In response to a Request for Admissions from Shepeard, Union Mortgage admitted the truth of the following statement: "In March of 1989 you or your agent(s) received a notice from Plaintiff's attorney indicating that Plaintiff was rescinding her credit transaction and mortgage." [16] (*Id.*) Although the Court could imagine a situation in which imposing TILA liability on an assignee that has received inadequate, or perhaps second-hand,

---

**14.** The Federal Reserve Board's interpretation of both the Act and its own regulations is entitled to considerable deference. *See Anderson Brothers Ford v. Valencia,* 452 U.S. 205, 219, 101 S.Ct. 2266, 2273, 68 L.Ed.2d 783 (1981); *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980).

**15.** Although the parties do not cite to any case dealing with the assignee's possible right to notice of rescission, the Court found one case that speaks to the issue. In *Federal Deposit Insurance Corp. v. Hughes Development Co., Inc.,* 684 F.Supp. 616, 618, 625 (D.Minn.1988), the court found that the plaintiffs' notice of rescission was valid against the FDIC, an assignee, even

though the notice had been directed to the original creditor and the FDIC denied any knowledge of the rescission. However, because the assignee in *Hughes* was the FDIC, a governmental agency entitled under the TILA to an exemption from civil penalties, the court did not have to address to what extent the assignee might be liable for the Act's $1,000 statutory penalty for disclosure violations and for failure to carry out rescission duties. *See id.* at 621–22.

**16.** Counsel for Union Mortgage also admitted during oral argument that Union had received Shepeard's notice.

notice may be unfair, this is not such a case.[17]

■ Union Mortgage's argument regarding its alleged inability to cancel the security interest on the Shepeard residence is equally unpersuasive, at least under the facts of this case. Assuming for the moment that Avco was the assignee when Union Mortgage received Shepeard's March 8th notice of rescission,[18] Union was nonetheless certainly the assignee when it filed its first answer on May 18, 1989. (*See* D.I. 4.) Thus, even if it could do nothing on March 8th, an issue we need not reach, Union Mortgage had notice of the rescission when it once again took assignment of the Shepeard mortgage in late April or early May. At that point, at the very latest, Union Mortgage had the power to carry out its rescission duties under the Act, but deliberately chose not to do so.

### c. The Effects of Rescission

■ Because Shepeard's attempt to rescind was in fact effective, the security interest held in her home automatically became void. 15 U.S.C. § 1635(b). Another consequence of the rescission is that Shepeard is no longer liable under the terms of the transaction. She need not pay "any finance or other charge...." *Id.* Furthermore, the Act dictates that "[w]ithin 20 days after receipt of a notice of rescission ...," the creditor must meet certain obligations. *Id.* First, the creditor must "return any money or property that has been given to anyone in connection with the transaction...." 12 C.F.R. § 226.23(d)(2). Even more importantly for purposes of this dispute, the creditor must also "take any action necessary to reflect the termination of the security interest." *Id.*

If the creditor does not properly respond to the consumer's notice of rescission, the consumer's obligation to the creditor "is eliminated entirely...."[19] *In re Gurst*, 79 B.R. 969, 979 (Bankr.E.D.Pa.1987). In fact, a consumer might even be entitled to keep all of the proceeds of the transaction. *See* 12 C.F.R. § 226.23(d)(3); *see also In re Tucker*, 74 B.R. 923, 933 (Bankr.E.D.Pa. 1987). As the *Gurst* court noted, however, it is appropriate to "consider the relative equities ... [before imposing] the full force of these consequences against a lender."

**17.** The Court would also note that, in light of the frequency with which consumer loans are assigned, it may well be that refusing to give effect to such an attempt to rescind would be equally unfair to the consumer.

Creditors are required to give consumers a notice explaining their rescission rights. This is a material disclosure requirement. Regulation Z dictates that the notice must "clearly and conspicuously disclose ... [h]ow to exercise the right to rescind, with a form for that purpose, designating the *address* of the *creditor's* place of business." 12 C.F.R. § 226.23(b) (emphasis added). The official comments to that section state that "[t]he creditor may designate an agent to receive the notification so long as the agent's name and address appear on the notice provided to the consumer under § 226.23(b)." 12 C.F.R. pt. 226, supp. 1 at 303–04 (1989). Clearly, the purpose of these provisions is to indicate to the consumer the manner in which she must exercise her rights and, more specifically, at whom she must direct her rescission efforts.

The rescission notice provided to Shepeard, and produced by Union Mortgage in the appendix to its brief, states under the heading "How to Cancel" the following: "If you decide to cancel this transaction, you may do so by notifying us in writing, at...." (D.I. 22A at C–9.) In the spaces underneath that printed sentence were handwritten in *Quality Siding's* name and address. (*See id.*) Since Union Mortgage voluntarily took over the Shepeard mortgage, in spite of the TILA violations apparent on the face of the underlying documents, it can hardly blame Shepeard for simply following the rescission instructions given in the disclosures she did receive.

**18.** The Court will infer this fact, which favors Union, even though the record is not completely clear on when Union first made the assignment to Avco.

**19.** There is some authority for the proposition that a creditor may be justified in delaying performance of its rescission duties when the consumer indicates up front that she intends to keep the creditor's property or only make partial restitution. *See Aquino v. Public Finance Consumer Discount Co.*, 606 F.Supp. 504, 508–09 (E.D.Pa.1985). In this case, however, defendants have not made such an argument. Moreover, there is no reason for the Court on its own to conclude that this rationale applies here as there is no indication in the record that Shepeard ever intended not to comply with her rescission obligations under the Act once defendants had done likewise. (*See, e.g.*, D.I. 24A at A–30 [plaintiff's notice of rescission, including offer to tender creditor's goods].)

*In re Gurst,* 79 B.R. at 979; *see also Brown v. National Permanent Federal Savings & Loan Association,* 683 F.2d 444, 447 (D.C.Cir.1982). Thus, courts have avoided such a harsh result when there is no evidence that the creditor tried to cheat or deceive the consumer. *Mayfield v. Vanguard Sav. & Loan Ass'n,* 710 F.Supp. 143, 147–48 (E.D.Pa.1989). *But cf. Gill v. Mid-Penn Consumer Discount Co.,* 671 F.Supp. 1021, 1026 (E.D.Pa.1987), *aff'd without opinion,* 853 F.2d 917 (3d Cir. 1988) (consumer need not repay any outstanding balance on loans because of creditor's failure to act on valid rescission notice).

In this case there is no dispute about the fact that neither defendant carried out its rescission duties. No monies were returned to Shepeard, and the mortgage on her home was not marked satisfied. Thus, all that remains is for the Court to determine what Shepeard's relief should be.

A relevant question in fashioning an appropriate rescission remedy is whether the consumer received any benefit from the home improvement work she bought. *See Brown v. Nat'l Permanent Fed. Sav. & Loan Ass'n,* 683 F.2d at 447. Another significant consideration, in determining whether the creditor's failure to comply with its rescission duties should relieve the consumer of all obligations undertaken in the transaction, is whether the consumer's notice of rescission was also accompanied by an offer to tender the proceeds of the transaction. *See id.* at 448. "Since rescission is an equitable remedy, the court may condition the return of monies to the debtor upon the return of property to the creditor." *Rudisell v. The Fifth Third Bank,* 622 F.2d 243, 254 (6th Cir.1980).

In a case such as this, in which the consumer received siding that could not be returned, one court held that the consumers were required to "tender the reasonable value of the property they received since they ... [could not] give back what they actually received...." *Id.* Both the Act and Regulation Z specifically sanction such a result. 15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(3). For example, Regulation Z provides that "the consumer shall tender the money or property to the creditor or, *where the latter would be impracticable or inequitable,* tender its *reasonable value.*" 12 C.F.R. § 226.23(d)(3) (emphasis added). The official comments to this provision also state that "the consumer may offer the creditor ... [the] reasonable value [of the property] rather than returning the property itself." 12 C.F.R. pt. 226, supp. 1 at 305 (1989). This commentary gives as an example building materials that have been incorporated into the consumer's home. *Id.*

The Court finds that the most equitable result in this case is for Shepeard to pay for the reasonable value of the siding work done on her home. However, other than her contention that labor costs should not be considered,[20] Shepeard has not proffered any argument regarding the reasonable value of the home improvements. Shepeard does not even provide a figure for the labor costs she urges should be discounted. Defendants have also provided no figures or arguments as to the reasonable value of the property at issue here. Given the lack of evidence or argument on this issue, the Court can only conclude that the parties do not dispute that the reasonable value of the home improvements is the price shown in the parties' contract. Thus, the Court finds that the reasonable value of the property provided to Shepeard is $13,000.00, the cash price listed for the

---

**20.** Shepeard argues that the reasonable value of the home improvements should not include any payment for labor. (*See* D.I. 24 at 16.) Shepeard cites no authority for this proposition, and the Court itself can detect no rationale for reading "reasonable value" as excluding payment for the labor involved in making the home improvements at issue here.

The only case cited by Shepeard in connection with her limited discussion of the reasonable value of the home improvements does not provide her with any support. In that case, *Rudisell v. Fifth Third Bank,* 622 F.2d at 254, the court conditioned rescission on the consumers' payment to the creditor of the reasonable value of the property received. The court, however, made no mention of deducting any labor costs when it remanded to the district court for a determination of reasonable value. *See id.*

work in the Lien Contract. (*See* Exhibit B, D.I. 21 at B–7.)

Shepeard paid $1,638.42 before rescinding the contract. (*See* D.I. 22A at C–6.) Thus, she still owes $11,361.58 for the property she received. Since Shepeard argued in her brief that she thought her payments were going to be $199 per month (D.I. 17 at 7), and the Cash Agreement gives that amount as the estimated payment figure (Exhibit A, D.I. 21 at B–5), the Court finds that it would be most equitable to allow Shepeard to pay for the siding at that monthly rate.[21] Accordingly, the Court will allow Shepeard to make payments of $199 each month until the $11,361.58 debt is repaid.[22]

## IV. Amount of Plaintiff's Recovery

In addition to the rescission remedy outlined above, Shepeard is entitled to recover from defendants a $1,000 statutory penalty[23] for the disclosure violations discussed previously. *See* 15 U.S.C. § 1640(a)(2). Shepeard is also entitled to recover another $1,000 statutory penalty from defendants for their failure to respond properly to her rescission demand.[24] *Id.; cf.* 15 U.S.C. § 1635(g). Finally, defendants are liable for suit costs and Shepeard's reasonable attorney's fees. *See* 15

---

21. Payments will be made to Union Mortgage, the party that currently holds Shepeard's note.

22. If Shepeard pays this minimum amount each month, her debt will be repaid in 58 months (i.e., $199 for 57 months, and $18.58 during the 58th month).

23. The Act states that the statutory penalty shall be *twice the amount of the finance charge*, but not less than $100 or greater than $1,000. 15 U.S.C. § 1640(a)(2). In this case, the finance charge was over $15,000, thereby calling for the maximum statutory penalty of $1,000.

24. Shepeard seeks a $2,000 statutory penalty for the *rescission* violations. Shepeard has, however, cited no authority or given any reason to support her claim for double recovery of statutory damages. Although the Act is not explicit on this point, the Court concludes Shepeard is entitled to only $1,000 for the rescission violations.

It is clear that Shepeard would be entitled to double the statutory penalty for *disclosure* violations if she had entered two *transactions*. *See* 15 U.S.C. § 1640(g); *see, e.g., Mayfield,* 710

---

U.S.C. § 1640(a)(3). With regard to the latter, the Court will allow the parties a period of time in which to try to work out among themselves the fee amount. If the parties are not able to agree, then the Court upon motion from Shepeard will determine what the fees for this case should be. If, however, plaintiff submits a reasonable request for fees and defendant refuses to satisfy that request, plaintiff will also be able to recover for the time spent by her attorney in connection with the motion for fees.

## V. Allocation of Liability Between Creditor and Assignee

Defendants have both filed cross-claims, seeking contribution or indemnification from each other. (D.I. 8 at ¶ 17; D.I. 11 at ¶ 15.) Neither party has moved for summary judgment on these claims, and the issues pertinent to their resolution have not been fully briefed. Accordingly, the cross-claims in this case are still pending. An appropriate order will follow.

## ORDER GRANTING SUMMARY JUDGMENT

For the reasons set forth in the Court's Memorandum Opinion entered in this action on this date, it is

---

F.Supp. at 146. But she would not be entitled to a double recovery for the disclosure violations just because two *parties* are liable. *See* 15 U.S.C. § 1640(g). On the other hand, Shepeard can receive another award of statutory damages, after receiving one for disclosure violations, if the second penalty is for a different type of violation, i.e. rescission. *Id.; see also* 15 U.S.C. § 1635(g).

Although the Act gives Shepeard the right to rescind as against an assignee, *see* 15 U.S.C. § 1641(c), the Act does not specifically provide for double statutory damages just because both an assignee and creditor have been held liable. *Cf. Abele,* 77 B.R. at 470 (multiple statutory penalties awarded for rescission violations when multiple transactions rescinded); *Mayfield,* 710 F.Supp. at 146 (same). Because the Act is silent regarding double damages for multiple rescission violations as to *one* transaction, and Shepeard has failed to explain or support her claim, the Court will limit the recovery of statutory damages for the rescission violations to one per transaction, as is the case with recovery for disclosure violations. The Court believes that in this case such an outcome is equitable.

ORDERED, ADJUDGED, AND DE-CREED that:

1. The motion for summary judgment filed by plaintiff, Doris M. Shepeard, is hereby granted as to Shepeard's claims against both defendants, Quality Siding & Window Factory, Inc., and Union Mortgage Company, Inc.

2. Judgment is hereby entered in favor of Shepeard and against defendants, jointly, in the amount of $2,000 (for statutory penalties for disclosure and rescission violations), together with suit costs and reasonable attorney's fees.

3. If the parties are not able to resolve among themselves the fee amount, Shepeard is directed to file with the Court a fee petition, with all of the necessary supporting documentation, on or before *March 5, 1990*, and the Court itself will determine the appropriate fee award. Defendants shall have 20 days to respond to any motion for fees filed by Shepeard.

4. Any security interest held in Shepeard's home, by virtue of the siding transaction entered into on April 5, 1988, is null and void. Defendants shall have 20 days from the date of this order to take all steps necessary to reflect the termination of such interests in Shepeard's property, located at 21 Kingston Road, New Castle, Delaware. Defendants shall also deliver to plaintiff, within 30 days from the date of this order, all documents evidencing any such security interests, and these documents shall be marked satisfied.

5. The transaction between Shepeard and defendants having been validly rescinded, Shepeard now owes defendant Union Mortgage, the current holder of the contract, only $11,361.58 (the $13,000.00 cash price of the siding less the $1,638.42 she has already paid). Shepeard shall have the option of either paying this sum in full within 30 days from the date of this order, or paying by monthly installments. If Shepeard chooses the latter option, she will pay Union Mortgage, beginning within 30 days from the date of this Order, at least $199 per month for 57 months and $18.58 during the 58th month.